## GOLDBERG ET AL. v. SWEET, DIRECTOR, ILLINOIS DEPARTMENT OF REVENUE, ET AL.

No. 87–826.   Argued October 12, 1988—Decided January 10, 1989*

---

*Together with No. 87–1101, *GTE Sprint Communications Corp.* v. *Sweet, Director, Illinois Department of Revenue, et al.,* also on appeal from the same court.

*Walter A. Smith, Jr.,* argued the cause for appellants. With him on the briefs for appellants Goldberg et al. were *John G. Roberts, Jr., John G. Jacobs,* and *William G. Clark,*

*Jr. Laura DiGiantonio, Richard N. Wiley,* and *Robert L. Weinberg* filed briefs for appellant GTE Sprint Communications Corp.

*Andrew L. Frey* argued the cause for appellees. On the brief were *Neil F. Hartigan,* Attorney General of Illinois, *Robert J. Ruiz,* Solicitor General, *Terry F. Moritz,* Special Assistant Attorney General, and *Alan P. Solow.*†

JUSTICE MARSHALL delivered the opinion of the Court.

In this appeal, we must decide whether a tax on interstate telecommunications imposed by the State of Illinois violates the Commerce Clause. We hold that it does not.

## I

### A

These cases come to us against a backdrop of massive technological and legal changes in the telecommunications industry.[1] Years ago, all interstate telephone calls were relayed through electric wires and transferred by human operators working switchboards. Those days are past. Today, a computerized network of electronic paths transmits thousands of electronic signals per minute through a complex system of microwave radios, fiber optics, satellites, and cables. DOJ

---

†*William C. Lane* filed a brief for the National Taxpayers Union as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the National Conference of State Legislatures et al. by *Benna Ruth Solomon, Joyce Holmes Benjamin, James F. Flug,* and *Martin Lobel;* and for MCI Telecommunications Corp. by *Frederic S. Lane, William T. Barker,* and *Walter Nagel.*

[1] See, *e. g.,* U. S. Dept. of Justice, The Geodesic Network: 1987 Report on Competition in the Telephone Industry (hereinafter DOJ Report) (discussing technological changes); Connecticut General Assembly, Final Report of the Connecticut Telecommunications Task Force, Finance, Revenue and Bonding Committee (1985) (discussing legal and technological changes); Council of State Policy & Planning Agencies, K. Case, State Tax Policy and the Telecommunications Industry, in The Challenge of Telecommunications State Regulatory and Tax Policies for a New Industry 33 (B. Dyer ed. 1986) (discussing changes in state taxation policies).

Report 1.2–1.6, 1.8; Brief for MCI Telecommunications Corporation as *Amicus Curiae* 2. When fully connected, this network offers billions of paths from one point to another. DOJ Report 1.18. When a direct path is full or not working efficiently, the computer system instantly activates another path. Signals may even change paths in the middle of a telephone call without perceptible interruption. Brief for National Conference of State Legislatures et al. as *Amici Curiae* 6. Thus, the path taken by the electronic signals is often indirect and typically bears no relation to state boundaries.[2] The number of possible paths, the nature of the electronic signals, and the system of computerized switching make it virtually impossible to trace and record the actual paths taken by the electronic signals which create an individual telephone call.

The explosion in new telecommunications technologies and the breakup of the AT&T monopoly[3] has led a number of States to revise the taxes they impose on the telecommunications industry.[4] In 1985, Illinois passed the Illinois

---

[2] A signal traveling from one microwave tower to another may pass through a State but never touch anything in it. A satellite transmission may leave a caller's building, travel to outer space, and remain there until it is received by a satellite dish at the building housing the receiving party. Brief for National Conference of State Legislatures et al. as *Amici Curiae* 6.

[3] See *United States* v. *American Tel. & Tel. Co.*, 552 F. Supp. 131 (DC 1982), summarily aff'd *sub nom. Maryland* v. *United States,* 460 U. S. 1001 (1983).

[4] See, *e. g.,* Ark. Code Ann. § 26–52–301 (Supp. 1987); Fla. Stat. § 212.05(1)(e) (Supp. 1988); Haw. Rev. Stat. § 237–13(6) (Supp. 1987); Minn. Stat. § 297A.01 Subd. 3(f) (Supp. 1987); N. M. Stat. Ann. § 7–9–56(C) (Supp. 1988); Ohio Rev. Code Ann. § 5739.01 (B)(3)(f) (Supp. 1987); Okla. Stat., Tit. 68, § 1354(1)(D) (Supp. 1987); Tex. Tax Code Ann. § 151.323 (Supp. 1988); Wash. Rev. Code § 82.04.065 (1987); Wis. Stat. § 77.51(14)(m) (1985–1986).

Some municipalities have begun to impose taxes on telephone calls. See, *e. g.,* Greeley, Colorado, Ordinance, Tit. 4, § 4.04.005 *et seq.* (1988);

Telecommunications Excise Tax Act (Tax Act), Ill. Rev. Stat., ch. 120, ¶¶ 2001–2021 (1987). The Tax Act imposes a 5% tax on the gross charge of interstate telecommunications (1) originated or terminated in Illinois, ¶ 2004, § 4 (hereinafter § 4)[5] and (2) charged to an Illinois service address, regardless of where the telephone call is billed or paid. ¶ 2002, §§ 2(a) and (b).[6] The Tax Act imposes an identical 5% tax on intrastate telecommunications. ¶ 2003, § 3. In order to prevent "actual multi-state taxation," the Tax Act provides a credit to any taxpayer upon proof that the taxpayer has paid a tax in another State on the same telephone call which triggered the Illinois tax. ¶ 2004, § 4. To facilitate collection, the Tax Act

---

Wheat Ridge, Colorado, Ordinance No. 630 (1985), Los Angeles, California, Ordinance No. 162586 (1987).

[5] Section 4 states in part:

"A tax is imposed upon the act or privilege of originating in this State or receiving in this State interstate telecommunications by a person in this State at the rate of 5% of the gross charge for such telecommunications purchased at retail from a retailer by such person."

"Gross charge" is defined as the amount paid for the telephone call, ¶ 2002, §§ 2(a) and (b), less charges for certain types of special equipment not at issue here. ¶ 2002, §§ 2(a)(1)–(5).

The Tax Act defines telecommunications broadly to include

"in addition to the meaning ordinarily and popularly ascribed to it, . . . without limitation, messages or information transmitted through use of local, toll and wide area telephone service; private line services; channel services; telegraph services; teletypewriter; computer exchange services; cellular mobile telecommunications service; specialized mobile radio; stationary two way radio; paging service; or any other form of mobile and portable one-way or two-way communications; or any other transmission of messages or information by electronic or similar means, between or among points by wire, cable, fiber-optics, laser, microwave, radio, satellite or similar facilities." ¶ 2002, § 2(b).

For the sake of simplicity, we use the terms "call" and "telephone call" to refer to these multifarious forms of telecommunications.

[6] Although not defined in the Tax Act, we understand the term "service address" to mean the address where the telephone equipment is located and to which the telephone number is assigned. See ¶ 2002, §§ 2(b) and (h).

requires telecommunications retailers, like appellant GTE Sprint Communications Corporation (Sprint), to collect the tax from the consumer who charged the call to his service address. ¶ 2005, § 5.

## B

Eight months after the Tax Act was passed, Jerome Goldberg and Robert McTigue, Illinois residents who are subject to and have paid telecommunications taxes through their retailers, filed a class action complaint in the Circuit Court of Cook County, Illinois. They named as defendants J. Thomas Johnson, Director of the Department of Revenue for the State of Illinois, (Director),[7] and various long-distance telephone carriers, including Sprint. The complaint alleged that § 4 of the Tax Act violates the Commerce Clause of the United States Constitution.[8] Sprint cross-claimed against the Director, seeking a declaration that the Tax Act is unconstitutional under the Commerce Clause. The Director then filed a motion for summary judgment against Sprint and the other long-distance carriers. Sprint responded with a motion for summary judgment against the Director; Goldberg and McTigue, in turn, filed their own motion for summary judgment against both the Director and Sprint.

After briefing and a hearing, the trial court declared § 4 unconstitutional. It found that *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S. 274 (1977), and its progeny control this litigation. Under the four-pronged test originated in *Complete Auto*, a state tax will withstand scrutiny under the Commerce Clause if "the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State."

---

[7] Roger Sweet has since replaced J. Thomas Johnson as Director of the Department of Revenue.

[8] Goldberg and McTigue also alleged that the Tax Act violates the Due Process and Equal Protection Clauses. They have abandoned these claims in this appeal. Brief for Appellants Goldberg and McTigue 9, n. 7.

*Id.*, at 279.[9]   In the view of the trial court, the Tax Act did not satisfy the last three prongs of the *Complete Auto* test because:

> "Illinois is attempting to tax the entire cost of an interstate act which takes place only partially in Illinois. This tax by its own terms is not fairly apportioned.   It discriminates against interstate commerce and it is not related to services provided in Illinois.   For all of these reasons the Act must fail."   *Goldberg* v. *Johnson*, No. 85 CH 8081 (Cook County, Oct. 21, 1986), App. to Juris. Statement in No. 87–826, p. 24a.

The Illinois Supreme Court reversed, *Goldberg* v. *Johnson*, 117 Ill. 2d 493, 512 N. E. 2d 1262 (1987) *(per curiam)* despite its finding that the tax is "not an apportioned tax" because it "applies to the entirety of each and every interstate telecommunication."   *Id.*, at 501, 512 N. E. 2d, at 1266.   The court reasoned that an unapportioned tax is "constitutionally suspect" because of the risk of multiple taxation, *ibid.*, but decided that the Tax Act adequately avoided this danger.   With respect to interstate calls originating in Illinois, the court noted that no other State could levy a tax on such calls.   *Id.*, at 502, 512 N. E. 2d, at 1266.   As for calls terminating in Illinois and charged to an Illinois service address, the court found that even though the tax created "a real risk of multiple taxation," *id.*, at 502, 512 N. E. 2d, at 1267,[10] that risk was eliminated by § 4's credit provision. *Id.*, at 503, 512 N. E. 2d, at 1267.

As for discrimination, the third prong of the *Complete Auto* test, the court held that the Tax Act is constitutionally valid since a 5% tax is imposed on intrastate as well as in-

___

[9] All parties conceded before the trial court, as they do here, that Illinois has a substantial nexus with the interstate telecommunications reached by the Tax Act.

[10] A collect call is one example of a telephone call which originates in another State but terminates in Illinois and is charged to an Illinois service address.

terstate telecommunications. Turning to the fourth prong, the court held that the tax is fairly related to services provided by Illinois. The court explained that Illinois provided services and other benefits with respect to that portion of an interstate call occurring within the State, and that "the benefits afforded by other States in facilitating the same interstate telecommunication are too speculative to override the substantial benefits extended by Illinois." *Id.*, at 504, 512 N. E. 2d, at 1267.

Having found that the Tax Act satisfied the requirements of *Complete Auto*, the Illinois Supreme Court concluded that it did not violate the Commerce Clause. Sprint, Goldberg, and McTigue appealed to this Court. We noted probable jurisdiction, 484 U. S. 1057 (1988), and now affirm.

## II

### A

This Court has frequently had occasion to consider whether state taxes violate the Commerce Clause. The wavering doctrinal lines of our pre-*Complete Auto* cases reflect the tension between two competing concepts: the view that interstate commerce enjoys a "free trade" immunity from state taxation; and the view that businesses engaged in interstate commerce may be required to pay their own way. *Complete Auto, supra*, at 278–279; see also *American Trucking Assns., Inc.* v. *Scheiner*, 483 U. S. 266, 281, 282, nn. 12, 13 (1987); *Commonwealth Edison Co.* v. *Montana*, 453 U. S. 609, 645 (1981) (BLACKMUN, J., dissenting). *Complete Auto* sought to resolve this tension by specifically rejecting the view that the States cannot tax interstate commerce, while at the same time placing limits on state taxation of interstate commerce. 430 U. S., at 288; see also *Commonwealth Edison Co., supra*, at 645.[11] Since the *Complete Auto* decision we have

---

[11] In *Complete Auto Transit, Inc.* v. *Brady*, we overruled *Spector Motor Service, Inc.* v. *O'Connor*, 340 U. S. 602 (1951), which had prohibited state taxation on the privilege of doing business within

applied its four-pronged test on numerous occasions.[12]   We now apply it to the Illinois tax.

## B

As all parties agree that Illinois has a substantial nexus with the interstate telecommunications reached by the Tax Act, we begin our inquiry with apportionment, the second prong of the *Complete Auto* test.   Appellants argue that the telecommunications tax is not fairly apportioned because Illinois taxes the gross charge of each telephone call.   They interpret our prior cases, specifically *Michigan-Wisconsin Pipe Line Co.* v. *Calvert,* 347 U. S. 157 (1954), *Central Greyhound Lines, Inc.* v. *Mealey,* 334 U. S. 653 (1948), and *Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250 (1938), to require Illinois to tax only a fraction of the gross charge of each telephone call based on the miles which the electronic signals traveled within Illinois as a portion of the total miles traveled.   The Director, in turn, argues that Illinois apportions its telecommunications tax by carefully limiting the type of interstate telephone calls which it reaches.

In analyzing these contentions, we are mindful that the central purpose behind the apportionment requirement is to

a State if the tax reached interstate commerce.   In *Complete Auto* we rejected *Spector*'s formalistic approach, stating that "[u]nder the present state of the law, the *Spector* rule, as it has come to be known, has no relationship to economic realities."   430 U. S., at 279.   We now seek to "'establish a consistent and rational method of inquiry' focusing on 'the practical effect of a challenged tax.'"   *Commonwealth Edison Co.* v. *Montana,* 453 U. S. 609, 615 (1981) (quoting *Mobil Oil Corp.* v. *Commissioner of Taxes of Vermont,* 445 U. S. 425, 443 (1980)).

[12] See, *e. g., D. H. Holmes Co.* v. *McNamara,* 486 U. S. 24 (1988) (use tax); *Wardair Canada Inc.* v. *Florida Dept. of Revenue,* 477 U. S. 1 (1986) (sales tax on fuel used in international commerce); *Commonwealth Edison Co.* v. *Montana, supra* (severance tax); *Maryland* v. *Louisiana,* 451 U. S. 725 (1981) (use tax); *Mobil Oil Corp.* v. *Commissioner of Taxes of Vermont,* 445 U. S. 425 (1980) (corporate income tax); *Washington Dept. of Revenue* v. *Association of Washington Stevedoring Cos.,* 435 U. S. 734 (1978) (business and occupation tax).

ensure that each State taxes only its fair share of an inter-
state transaction. See, *e. g., Container Corp. of America* v.
*Franchise Tax Bd.*, 463 U. S. 159, 169 (1983). But "we have
long held that the Constitution imposes no single [apportion-
ment] formula on the States," *id.*, at 164, and therefore have
declined to undertake the essentially legislative task of estab-
lishing a "single constitutionally mandated method of tax-
ation." *Id.*, at 171; see also *Moorman Mfg. Co.* v. *Bair*, 437
U. S. 267, 278–280 (1978). Instead, we determine whether
a tax is fairly apportioned by examining whether it is in-
ternally and externally consistent. *Scheiner, supra*, at 285;
*Armco Inc.* v. *Hardesty*, 467 U. S. 638, 644 (1984); *Container
Corp., supra*, at 169–170.

To be internally consistent, a tax must be structured so
that if every State were to impose an identical tax, no multi-
ple taxation would result. 463 U. S., at 169. Thus, the in-
ternal consistency test focuses on the text of the challenged
statute and hypothesizes a situation where other States have
passed an identical statute. We conclude that the Tax Act is
internally consistent, for if every State taxed only those in-
terstate phone calls which are charged to an in-state service
address, only one State would tax each interstate telephone
call.

Appellant Sprint argues that our decision in *Armco* dic-
tates a different standard. It contends that, under *Armco*, a
court evaluating the internal consistency of a challenged tax
must also compare the tax to the similar, but not identical,
taxes imposed by other States. Sprint misreads *Armco*. If
we were to determine the internal consistency of one State's
tax by comparing it with slightly different taxes imposed by
other States, the validity of state taxes would turn solely
on "the shifting complexities of the tax codes of 49 other
States." *Armco, supra*, at 645; see also *Moorman, supra*, at
277, n. 12. In any event, to the extent that other States
have passed tax statutes which create a risk of multiple tax-

ation, we reach that issue under the external consistency test, to which we now turn.

The external consistency test asks whether the State has taxed only that portion of the revenues from the interstate activity which reasonably reflects the in-state component of the activity being taxed. *Container Corp., supra,* at 169–170. We thus examine the in-state business activity which triggers the taxable event and the practical or economic effect of the tax on that interstate activity. Appellants first contend that any tax assessed on the gross charge of an interstate activity cannot reasonably reflect in-state business activity and therefore must be unapportioned. The Director argues that, because the Tax Act has the same economic effect as a sales tax, it can be based on the gross charge of the telephone call. See, *e. g., McGoldrick* v. *Berwind-White Coal Mining Co.,* 309 U. S. 33, 58 (1940) (sales tax); cf. *D. H. Holmes Co.* v. *McNamara,* 486 U. S. 24, 31–32 (1988) (use tax); *Tyler Pipe Industries, Inc.* v. *Washington Dept. of Revenue,* 483 U. S. 232, 251 (1987) (gross receipts).

We believe that the Director has the better of this argument. The tax at issue has many of the characteristics of a sales tax. It is assessed on the individual consumer, collected by the retailer, and accompanies the retail purchase of an interstate telephone call. Even though such a retail purchase is not a purely local event since it triggers simultaneous activity in several States, cf. *McGoldrick, supra,* at 58, the Tax Act reasonably reflects the way that consumers purchase interstate telephone calls.

The Director further contends that the Illinois telecommunications tax is fairly apportioned because the Tax Act reaches only those interstate calls which are (1) originated or terminated in Illinois and (2) charged to an Illinois service address. Appellants Goldberg and McTigue, by contrast, raise the specter of many States assessing a tax on the gross charge of an interstate telephone call. Appellants have exaggerated the extent to which the Tax Act creates a risk of

multiple taxation. We doubt that States through which the telephone call's electronic signals merely pass have a sufficient nexus to tax that call. See *United Air Lines, Inc.* v. *Mahin*, 410 U. S. 623, 631 (1973) (State has no nexus to tax an airplane based solely on its flight over the State); *Northwest Airlines, Inc.* v. *Minnesota*, 322 U. S. 292, 302–304 (1944) (Jackson, J., concurring) (same). We also doubt that termination of an interstate telephone call, by itself, provides a substantial enough nexus for a State to tax a call. See *National Bellas Hess, Inc.* v. *Department of Revenue of Illinois*, 386 U. S. 753 (1967) (receipt of mail provides insufficient nexus).

We believe that only two States have a nexus substantial enough to tax a consumer's purchase of an interstate telephone call. The first is a State like Illinois which taxes the origination or termination of an interstate telephone call charged to a service address within that State. The second is a State which taxes the origination or termination of an interstate telephone call billed or paid within that State. See, *e. g.*, Ark. Code Ann. § 26–52–301(3) (Supp. 1987); Wash. Rev. Code § 82.04.065(2) (1987).

We recognize that, if the service address and billing location of a taxpayer are in different States, some interstate telephone calls could be subject to multiple taxation.[13] This

---

[13] Those taxpayers who split their billing and service addresses between two different States face a risk of multiple taxation on a limited number of their interstate telephone calls. For example, if a company's Arkansas headquarters paid the telephone bills of its Illinois subsidiary, two state taxes would be paid on telephone calls made by the Illinois subsidiary to the head office or any other Arkansas location. Such calls would terminate and be billed or paid in Arkansas, and they would also originate and be charged to an Illinois service address. Likewise, a collect call from the Arkansas headquarters to the Illinois subsidiary could be taxed in both States. The collect call would originate and be billed or paid in Arkansas, and it would also terminate and be charged to an Illinois service address. Noncollect calls from the Arkansas headquarters to the Illinois subsidiary would not, however, be captured by the Illinois Tax Act. Likewise, the

limited possibility of multiple taxation, however, is not sufficient to invalidate the Illinois statutory scheme. See *Container Corp.*, 463 U. S., at 171; *Moorman*, 437 U. S., at 272–273. To the extent that other States' telecommunications taxes pose a risk of multiple taxation, the credit provision contained in the Tax Act operates to avoid actual multiple taxation. *D. H. Holmes, supra,* at 31 ("The . . . taxing scheme is fairly apportioned, for it provides a credit against its use tax for sales taxes that have been paid in other States"); see also *Tyler Pipe, supra,* at 245, n. 13.

It should not be overlooked, moreover, that the external consistency test is essentially a practical inquiry. In previous cases we have endorsed apportionment formulas based upon the miles a bus, train, or truck traveled within the taxing State.[14] But those cases all dealt with the movement of large physical objects over identifiable routes, where it was practicable to keep track of the distance actually traveled within the taxing State. See, *e. g., Central Greyhound,* 334 U. S., at 663 ("There is no dispute as to feasibility in apportioning this tax"); see also *Western Live Stock,* 303 U. S., at 257. These cases, by contrast, involve the more intangible movement of electronic impulses through computerized networks. An apportionment formula based on mileage or some other geographic division of individual telephone calls would produce insurmountable administrative and technologi-

---

Arkansas statute would not tax interstate calls made by the Illinois subsidiary to States other than Arkansas.

[14] Many of our Commerce Clause decisions concern state taxes on the movement of goods or the instrumentalities of interstate transportation. See, *e. g., American Trucking Assns., Inc.* v. *Scheiner,* 483 U. S. 266 (1987) (trucks); *Japan Line, Ltd.* v. *County of Los Angeles,* 441 U. S. 434 (1979) (cargo containers); *Complete Auto Transit, Inc.* v. *Brady,* 430 U. S. 274 (1977) (motor carriers); *Michigan-Wisconsin Pipe Line Co.* v. *Calvert,* 347 U. S. 157 (1954) (oil pipelines); *Central Greyhound Lines, Inc.* v. *Mealey,* 334 U. S. 653 (1948) (buses); cf. *Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250, 257 (1938) (tax on gross receipts of intrastate train travel is valid while a like tax on an interstate train travel is not).

cal barriers. See *Scheiner*, 483 U. S., at 296 (apportionment does not require State to adopt a tax which would "pose genuine administrative burdens").[15] We thus find it significant that Illinois' method of taxation is a realistic legislative solution to the technology of the present-day telecommunications industry.[16]

In sum, we hold that the Tax Act is fairly apportioned. Its economic effect is like that of a sales tax, the risk of multiple taxation is low, and actual multiple taxation is precluded by the credit provision. Moreover, we conclude that mileage or some other geographic division of individual telephone calls would be infeasible.

## C

We turn next to the third prong of the *Complete Auto* test, which prohibits a State from imposing a discriminatory tax on interstate commerce. Appellants argue that irrespective of the identical 5% tax on the gross charge of intrastate telephone calls, the Tax Act discriminates against interstate commerce by allocating a larger share of the tax burden to interstate telephone calls. They rely on *Scheiner*, where we

---

[15] Sprint alleges that it is "capable, administratively, of billing more than one state's tax on a single interstate communication." Brief for Appellant GTE Sprint Communications Corp. 4. This statement, however, tells us no more than that Sprint's computerized billing system is capable of adding another line to consumers' bills. Sprint does not explain, however, how it would keep track of and record the exact paths and in-state mileage of thousands of electronic impulses per minute.

[16] Years ago, we considered and rejected certain state taxes on interstate telecommunications. See, *e. g.*, *Cooney* v. *Mountain States Tel. & Tel. Co.*, 294 U. S. 384 (1935); *Western Union Tel. Co.* v. *Pennsylvania*, 128 U. S. 39 (1888); *Ratterman* v. *Western Union Tel. Co.*, 127 U. S. 411 (1888); cf. *Pensacola Tel. Co.* v. *Western Union Tel. Co.*, 96 U. S. 1 (1878) (because the telegraph industry is interstate commerce, Act of Congress pre-empts state regulation). These cases considered a telecommunications technology only distantly related to modern telecommunications technology and were decided in a pre-*Complete Auto* era when this Court held the view that interstate commerce itself could not be taxed. See n. 11, *supra*.

stated that, "[i]n its guarantee of a free trade area among the States, . . . the Commerce Clause has a deeper meaning that may be implicated even though state provisions . . . do not allocate tax burdens between insiders and outsiders in a manner that is facially discriminatory." *Scheiner, supra,* at 281.

In *Scheiner,* we held that Pennsylvania's flat taxes on the operation of all trucks on Pennsylvania highways imposed a disproportionate burden on interstate trucks, as compared with intrastate trucks, because the interstate trucks traveled fewer miles per year on Pennsylvania highways. 483 U. S., at 286. The Illinois tax differs from the flat taxes found discriminatory in *Scheiner* in two important ways. First, whereas Pennsylvania's flat taxes burdened out-of-state truckers who would have difficulty effecting legislative change, the economic burden of the Illinois telecommunications tax falls on the Illinois telecommunications consumer, the insider who presumably is able to complain about and change the tax through the Illinois political process. It is not a purpose of the Commerce Clause to protect state residents from their own state taxes.

Second, whereas with Pennsylvania's flat taxes it was possible to measure the activities within the State because truck mileage on state highways could be tallied, reported, and apportioned, the exact path of thousands of electronic signals can neither be traced nor recorded. We therefore conclude that the Tax Act does not discriminate in favor of intrastate commerce at the expense of interstate commerce.

### D

Finally, we reach the fourth prong of the *Complete Auto* test, namely, whether the Illinois tax is fairly related to the presence and activities of the taxpayer within the State. See *D. H. Holmes,* 486 U. S., at 32–34. The purpose of this test is to ensure that a State's tax burden is not placed upon

persons who do not benefit from services provided by the State. *Commonwealth Edison,* 453 U. S., at 627.

Appellants would severely limit this test by focusing solely on those services which Illinois provides to telecommunications equipment located within the State. We cannot accept this view. The tax which may be imposed on a particular interstate transaction need not be limited to the cost of the services incurred by the State on account of that particular activity. *Id.,* at 627, n. 16. On the contrary, "interstate commerce may be required to contribute to the cost of providing *all* governmental services, including those services from which it arguably receives no direct 'benefit.'" *Ibid.* (emphasis in original). The fourth prong of the *Complete Auto* test thus focuses on the wide range of benefits provided to the taxpayer, not just the precise activity connected to the interstate activity at issue. Indeed, last Term, in *D. H. Holmes, supra,* at 32, we noted that a taxpayer's receipt of police and fire protection, the use of public roads and mass transit, and the other advantages of civilized society satisfied the requirement that the tax be fairly related to benefits provided by the State to the taxpayer.

In light of the foregoing, we have little difficulty concluding that the Tax Act is fairly related to the benefits received by Illinois telephone consumers. The benefits that Illinois provides cannot be limited to those exact services provided to the equipment used during each interstate telephone call. Illinois telephone consumers also subscribe to telephone service in Illinois, own or rent telephone equipment at an Illinois service address, and receive police and fire protection as well as the other general services provided by the State of Illinois.

### III

For the reasons stated above, we hold that the telecommunications tax imposed by the Tax Act is consistent with the Commerce Clause. It is fairly apportioned, does not discriminate against interstate commerce, and is fairly re-

lated to services which the State of Illinois provides to the taxpayer. The judgment of the Illinois Supreme Court is hereby

*Affirmed.*

JUSTICE STEVENS, concurring in part and concurring in the judgment.

My reasons for concluding that the Illinois tax does not discriminate against interstate commerce are different from those expressed in Part II–C of the Court's opinion. Unlike the Court, I do not believe Illinois may discriminate among its own residents by placing a heavier tax on those who engage in interstate commerce than on those who merely engage in local commerce. See *ante,* at 266 ("It is not a purpose of the Commerce Clause to protect state residents from their own state taxes"). In fact, such a holding is a clear departure from our precedents. See, *e. g., Tyler Pipe Industries, Inc.* v. *Washington Dept. of Revenue,* 483 U. S. 232, 240–248 (1987) (invalidating manufacturing tax that discriminated between in-state manufacturers that sold at wholesale in state and those that sold at wholesale out of state); *Bacchus Imports, Ltd.* v. *Dias,* 468 U. S. 263 (1984) (invalidating tax exemption for locally produced alcoholic beverages in case brought by local wholesalers); *Boston Stock Exchange* v. *State Tax Comm'n,* 429 U. S. 318, 333–334 (1977) (invalidating securities transfer tax that discriminated against those state residents who sold out of state rather than in state). Surely a state tax of 3% on the shipment of goods intrastate and of 5% on the shipment of goods interstate would violate the Commerce Clause.[1]

---

[1] Perhaps it is the sales tax-like attributes of the Tax Act that have persuaded the Court to dismiss the discrimination claim by focusing solely on the sales tax-like impact on local residents. See *ante,* at 262, 265, 266. A State may assess a sales tax on the entire value of the purchased item even though some amount of that value was added in other States. Appellees have contended throughout this litigation that the tax involved here should be viewed as a sales tax on the cost of the phone call. The state court

Appellants' discrimination claim can best be illustrated by example: A call originating and terminating in Illinois that costs $10 is taxed at full value at 5%. A second call, originating in Illinois but terminating in Indiana, costs the same $10 and is taxed at the same full value at the same 5% rate. But while Illinois may properly tax the entire $10 of the first call, it (technically) may tax only that portion of the second call over which it has jurisdiction, namely, the intrastate portion of the call (say, for example, $5). By imposing an identical 50¢ tax on the two calls, Illinois has imposed a disproportionate economic burden on the interstate call. See *American Trucking Assns., Inc.* v. *Scheiner*, 483 U. S. 266 (1987) (invalidating flat tax that imposed disproportionate economic burden on interstate commerce).

This argument, however, overlooks the true overall incidence of the Illinois tax. Although Illinois taxes the entirety of every call charged to an Illinois number, it does not tax any part of the calls that are received at an Illinois number but charged elsewhere. Thus, although Illinois taxes the entire Illinois-Indiana $10 call, it taxes no part of the reciprocal Indiana-Illinois $10 call. At the 5% rate, Illinois receives 50¢ from the two calls combined, precisely the amount it receives from one $10 purely intrastate call. By taxing half of the relevant universe of interstate calls at full value, Illinois

refused to so characterize the tax, instead concluding that the tax was assessed on interstate commerce. *Goldberg* v. *Johnson*, 117 Ill. 2d 493, 498–500, 512 N. E. 2d 1262, 1265–1266 (1987) *(per curiam)*. Although the Court's analysis is properly informed by the sales tax-like attributes of the tax in question, it does not ultimately challenge the state court's characterization of the tax and does not rest its holding on a recharacterization of the tax as a sales tax. Thus, it is insufficient to say, in response to the discrimination argument advanced by appellants, that because the tax burden falls only on the Illinois consumer, the tax—like a sales tax with a similar burden—is nondiscriminatory. Because the premise of our review of the Tax Act is that it applies to interstate activity, we must go further in responding to appellants' contention that the Act imposes a disproportionate burden on interstate commerce.

achieves the same economic result as taxing all of those calls at half value would achieve. As a result, interstate phone calls are taxed at a lower effective rate than intrastate calls,[2] and accordingly bear a proportional tax burden.[3]

With the exception of Part II–C, I join the Court's opinion.

JUSTICE O'CONNOR, concurring in part and concurring in the judgment.

I agree that the Illinois Telecommunications Excise Tax Act does not violate the Commerce Clause, and join Parts I, II–A, II–D, and III of the Court's opinion. I write separately to explain why I do not join Parts II–B and II–C. First, I am still unsure of the need and authority for applying the internal consistency test to state taxes challenged under the Commerce Clause. See *American Trucking Assns., Inc.* v. *Scheiner*, 483 U. S. 266, 303 (1987) (O'CONNOR, J., dissenting). I therefore do not join in the Court's application of that test to the Tax Act. *Ante*, at 261. Second, I agree with JUSTICE STEVENS that a State may not discriminate among its own residents by placing a heavier tax on those who engage in interstate commerce than those who merely engage in local commerce. *Ante*, at 268 (STEVENS, J., concurring in part and concurring in judgment). Accordingly, I cannot join the Court's statement that "[i]t is not a purpose of the Commerce Clause to protect state residents from their own state taxes." *Ante*, at 266.

---

[2] That is, half of the interstate calls are taxed at 5%, but the other half are taxed at 0%; the effective rate is $2\frac{1}{2}\%$. On the other hand, all intrastate calls are taxed at 5%.

[3] This analysis is not obviated by the Court's statement, with which I agree, that "[w]e . . . doubt that termination of an interstate telephone call, by itself, provides a substantial enough nexus for a State to tax a call." *Ante*, at 263. That one State through which interstate commerce flows may not constitutionally tax such commerce does not mean that another State may make up for the gap, as it were, by taxing its share as well as the first State's share. Thus, even if Indiana could not constitutionally tax the mere termination of an Illinois-Indiana call, Illinois still may tax only the portion of the call over which it has jurisdiction.

JUSTICE SCALIA, concurring in the judgment.

I remain of the view that only state taxes that facially discriminate against interstate commerce violate the negative Commerce Clause, see *Tyler Pipe Industries, Inc.* v. *Washington Dept. of Revenue*, 483 U. S. 232, 254 (1987) (SCALIA, J., concurring in part and dissenting in part); *American Trucking Assns., Inc.* v. *Scheiner*, 483 U. S. 266, 303 (1987) (SCALIA, J., dissenting). Because the Illinois Telecommunications Excise Tax is assessed upon intrastate and interstate calls at precisely the same rate, it poses no constitutional difficulty.