2008 ME 171

**GANNETT CO., INC., et al.**

v.

**STATE TAX ASSESSOR.**

Supreme Judicial Court of Maine.

Argued: April 9, 2008.
Decided: Nov. 18, 2008.

Sarah H. Beard, Esq., Daniel M. Snow, Esq. (orally), Pierce Atwood, LLP, Portland, ME, Scott D. Smith, Esq., LeClair Ryan, P.C., Washington, DC, for Gannett Co., Inc., and its affiliates.

G. Steven Rowe, Attorney General, Thomas A. Knowlton, Asst. Atty. Gen. (orally), Scott W. Boak, Asst. Atty. Gen., Augusta, ME, for the State Tax Assessor.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

SILVER, J.

[¶ 1] The State Tax Assessor appeals from a summary judgment entered in the Superior Court (Kennebec County, *Marden, J.*). The Assessor argues that the court erred in granting the motion for summary judgment by Gannett Co., Inc., and vacating the Assessor's decision as to Gannett's corporate income tax liability for the tax year 2000. In addition, the Assessor argues that the court erred in concluding that Gannett's income from the sale of its Cable Division must be excluded from Gannett's tax liability because the Cable Division was not part of its unitary business. Because we agree that Gannett's cable, broadcast news, and newspaper publications constituted a unitary business, and also that taxing Gannett on an apportioned share of the income earned from the sale of its cable acquisition does not violate its due process rights, we vacate the decision of the Superior Court.

## I. BACKGROUND

[¶ 2] Gannett and its affiliates comprise a multinational newspaper and broadcast television business. In 1995, Gannett sought to purchase newspaper and broadcast television businesses owned by Multimedia, Inc. Multimedia refused to sell those businesses without selling its cable television systems, security alarm business, and entertainment production business. Gannett agreed to purchase all of Multimedia. Gannett sold the entertainment and security alarm businesses soon after the acquisition, but chose not to sell its cable television systems (Cable Division) for tax and other reasons. The Cable Division distributed cable television services to residential subscribers through a coaxial or fiber optic cable system pursuant to cable television franchises granted by municipalities in Kansas, Oklahoma, and North Carolina.

[¶ 3] The acquisition of the Cable Division proved to be a lucrative investment for Gannett. On January 31, 2000, Gannett sold the Cable Division for $2.75 billion, realizing a taxable gain of $2.54 billion. Over a third of the gain realized by the sale resulted because Gannett inherited a very low tax basis in the assets when it acquired the Cable Division. Because Gannett purchased the Cable Division in a stock transaction (by purchasing stock of the parent company Multimedia, Inc.), Gannett inherited Multimedia's historical tax basis.

[¶ 4] The president of the Cable Division, who was responsible for its management, reported to the president of Gannett's Broadcasting Division. When the Cable Division president wished to hire or fire anyone in his division who reported directly to him, he needed the approval of Gannett management. During the period of 1996 through 2000, the general counsel of Gannett's Broadcasting Division simultaneously served as general counsel for the Cable Division. In addition, Gannett's assistant general counsel provided legal services to the Cable Division upon request.

[¶ 5] Along with newspaper publishing and broadcast television, Gannett reported the Cable Division as one of its three core businesses in its 1998 annual report. By the end of 1998, the Cable Division's operations served about 514,000 customers in three states. All income from the Cable Division was reported on Gannett's financial statements and tax returns as "operational" income, not investment income. Gannett treated Cable as one of its "businesses" for purposes of SEC reporting.

[¶ 6] Gannett distributes a few of its national newspapers in Maine, and in 1998, Gannett bought the NBC-affiliated television stations in Portland and Bangor. During the period of 1995 through 2000, Gannett filed tax returns in Maine, reporting the Cable Division as part of a single combined group with the newspaper and broadcast television divisions. In 2003, Maine Revenue Services examined Gannett's Maine tax returns for 1999, 2000, and 2001. The returns for 1999 and 2000 depicted Gannett as a unitary business that included the Cable Division. In addition, the 2000 tax return included the $2.54 billion gain from the sale of the Cable Division as income. Gannett paid approximately $1.2 million in Maine taxes for 2000. Gannett also filed as a unitary business in Kansas, Idaho, Illinois, Indiana, Montana, Minnesota, Nebraska, New Hampshire, and Utah from 1998 through 2000, among other years. In its 2000 Kansas tax return, Gannett swore under oath that the Cable Division was part of a unitary business with all other Gannett affiliates, including those engaged in newspaper publishing and broadcast television.

[¶ 7] Later arguing that the Cable Division was *not* part of its unitary business, Gannett made a claim for a refund of corporate income tax for tax year 2000 in the amount of $718,729 to the Maine Assessor. Initially, the Maine Revenue Services auditor agreed with Gannett, but after further reflection denied its request. Following the Assessor's decision, Gannett sought judicial review by the Superior Court pursuant to 36 M.R.S. § 151 (2007) and M.R. Civ. P. 80C. The parties subsequently filed cross-motions for summary judgment pursuant to M.R. Civ. P. 56.

[¶ 8] The Superior Court conducted a de novo hearing and made a de novo determination on the merits of the case. *See* 36 M.R.S. § 151. The court granted Gannett's motion for a summary judgment on its petition for judicial review and vacated the Assessor's decision on reconsideration in the matter of corporate income tax for the tax year 2000. The court found that no rational relationship existed between

the income attributed to the State of Maine and the intrastate value Gannett derived from operating its two television stations and national newspapers. In its order, the court stated that it

> finds weak evidence that the cable activities were integrated with the communications and media businesses and is not satisfied that cable was dependent upon the remaining corporate activities. While it could be said that cable, in some limited respects, is in the same business as newspapers, radio and television, there does not appear to be strong centralized management. While there is some evidence that some financing took place for the cable company by the petitioner, the evidence is meager that purchasing, advertising and research were an integrated activity.... While the minimal connection between the intrastate activities of [Gannett] and the State of Maine meets the requirements of due process, *the absence of the rational relationship is fatal to the Assessor's case.*

(Emphasis added.)

[¶ 9] This appeal by the Assessor followed.

## II. DISCUSSION

### A. Standard of Review

[¶ 10] Gannett has the burden of proof on all factual and legal issues in this case. 36 M.R.S. § 151. When evaluating the Superior Court's review of Assessor decisions, we consider the court's determinations of law de novo, and we review its findings of facts for clear error. *Flik Int'l Corp. v. State Tax Assessor,* 2002 ME

176, ¶ 8, 812 A.2d 974, 976–77. The issue of whether Gannett constituted a unitary business is a matter of law. *Earth Res. Co. v. Dep't of Revenue,* 665 P.2d 960, 964 (Alaska 1983). In addition, we review de novo the constitutionality of Maine's tax apportionment formula, 36 M.R.S.A. § 5211 (1990 & Supp.2000),[1] as it applies to Gannett. *See Rideout v. Riendeau,* 2000 ME 198, ¶ 14, 761 A.2d 291, 297. We presume the statute to be constitutional. *Id.* Gannett has the burden of establishing its infirmity. *Id.*

### B. Legal Analysis

#### 1. Unitary Business Standard

[¶ 11] When a corporation and its affiliates transact business in several states, each state must determine how much of the corporation's total income and losses are attributable to that state as opposed to other states. States are limited in their ability to tax the income of non-domiciled taxpayers by the Due Process and Commerce Clauses of the United States Constitution. *MeadWestvaco Corp. v. Ill. Dep't of Revenue,* 553 U.S. ——, ——, 128 S.Ct. 1498, 1505, 170 L.Ed.2d 404 (2008); *Allied–Signal, Inc. v. Dir., Div. of Taxation,* 504 U.S. 768, 777–78, 112 S.Ct. 2251, 119 L.Ed.2d 533 (1992). A state may only tax an activity to which it has a definite link or connection. *MeadWestvaco Corp.,* 128 S.Ct. at 1505. "[A] State may not, when imposing an income-based tax, tax value earned outside its borders." *Container Corp. of Am. v. Franchise Tax Bd.,* 463 U.S. 159, 164, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983) (quotation marks omitted).

---

1. Title 36 M.R.S.A. § 5211 has been amended several times since 2000, most recently at P.L. 2007, ch. 240, §§ V–2 to V–12, V–15 (effective June 7, 2007) (codified at 36 M.R.S. § 5211 (2007)). However, Gannett sold the Cable Division in 2000. Therefore, the 2000 version of 36 M.R.S.A. § 5211 (1990 & Supp.2000) is the appropriate version for consideration on appeal.

■ [¶ 12] Maine uses the unitary business/formula apportionment approach to identify in-state value. *Tambrands, Inc. v. State Tax Assessor,* 595 A.2d 1039, 1040–41 (Me.1991); 36 M.R.S.A. § 5211(1) (1990). Under this approach, if activities inside and outside of the taxing state constitute one single integrated business enterprise, such that both in-state and out-of-state activities operate as a unit in the ultimate production of income, it is fair to include the income from out-of-state activities in apportionable income. *Container Corp.,* 463 U.S. at 165–66, 103 S.Ct. 2933. A unitary business is defined statutorily to mean "a business activity which is characterized by unity of ownership, functional integration, centralization of management and economies of scale." 36 M.R.S. § 5102(10–A) (2007).

■ [¶ 13] The "hallmarks" of a unitary business relationship are "functional integration, centralized management, and economies of scale." *MeadWestvaco Corp.,* 128 S.Ct. at 1508. A unitary business is a functionally integrated enterprise whose parts are mutually interdependent such that there is a substantial flow of value between them. *See Container Corp.,* 463 U.S. at 164–66, 103 S.Ct. 2933. The unitary business concept ignores the separate legal existence of corporations (which are easily manipulated), and focuses on such practical business realities as transfers of value among affiliated corporations. *See Allied–Signal,* 504 U.S. at 781–83, 112 S.Ct. 2251.

■ [¶ 14] The U.S. Supreme Court's test is not a bright-line rule. Rather, the issue of whether a business is unitary is determined on a case-by-case basis, after examining all of the relevant facts and circumstances. *See Container Corp.,* 463 U.S. at 166, 178 n. 17, 103 S.Ct. 2933. In addition, the relevant Maine Revenue Services rule states in part:

> The activities of a taxpayer will be deemed to constitute a single business if those activities are integrated with, dependent upon and contributive to each other and to the operations of the taxpayer as a whole. The presence of any of the following factors creates a presumption that the activities of the taxpayer constitute a single trade or business:
>
> (1) All activities are in the same general line or type of business; [or]
>
> . . . .
>
> (3) The taxpayer is characterized by strong centralized management including centralized departments for such functions as financing, purchasing, advertising and research.

4 C.M.R. 18 125 801–1 § 0.1(A) (2000).[2]

[¶ 15] In *Container Corp.,* the United States Supreme Court held that "the out-of-state activities of the purported 'unitary business' [must] be related in some concrete way to the in-state activities," in that there exists "some sharing or exchange of value not capable of precise identification or measurement—beyond the mere flow of funds arising out of a passive investment or distinct business operation." 463 U.S. at 166, 103 S.Ct. 2933. In *Container Corp.,* the corporate taxpayer and its subsidiaries were held to be a unitary business because the subsidiaries carried on nearly identical businesses in several countries that were linked by a sharing of technical expertise and financial resources, and a management role by the parent that

---

**2.** This section of the rule was subsequently modified in 2001 and moved from section 0.1 to section 0.2. However, as discussed *infra,* the 2000 version of the rule applies to this case.

was grounded in its own operational strategy and expertise. *Id.* at 178–180 n. 19.

[¶ 16] While "[i]nvestment in a business enterprise truly 'distinct' from a corporation's main line of business" often serves as a passive investment, such as to diversify the parent's portfolio, in contrast:

[w]hen a corporation invests in a subsidiary that engages in the same line of work as itself, it becomes much more likely that one function of the investment is to make better use—either through economies of scale or through operational integration or sharing of expertise—of the parent's existing business-related resources.

*Id.* at 178, 103 S.Ct. 2933. As in *Container Corp.,* the Cable Division formed part of a single business enterprise with Gannett's newspaper and broadcast television operations so that the production of income by the Cable Division in Kansas and elsewhere was integrated with Gannett's newspaper and broadcast television operations in Maine. In 1998, Gannett's annual report listed cable as one of its three core businesses. Gannett's operations were integrated. One entity supplied technical expertise concerning production and performed key business functions critical to the generation of income by Gannett and its affiliates, which included the Cable Division and Gannett's Maine operations.

[¶ 17] The Supreme Court's standard for establishing a unitary business requires a court to distinguish between entities that have significant operational connections and truly function as one business enterprise, *see, e.g., Container Corp.,* 463 U.S. 159, 103 S.Ct. 2933, 77 L.Ed.2d 545; *Exxon Corp., v. Wisconsin Department of Revenue,* 447 U.S. 207, 100 S.Ct. 2109, 65 L.Ed.2d 66 (1980), and those that have some connections but do not function as a unitary business, *see, e.g., F.W. Woolworth Co. v. Taxation & Reve-*

*nue Department,* 458 U.S. 354, 369, 102 S.Ct. 3128, 73 L.Ed.2d 819 (1982). There must be a flow of value, often characterized by substantial mutual interdependence, for a business to be unitary. *Container Corp.,* 463 U.S. at 178–79, 103 S.Ct. 2933. No one fact necessarily determines whether functional integration, centralization of management or economies of scale exist. *Id.* at 179–80, 103 S.Ct. 2933. Rather, the totality of the facts are examined and weighed for cumulative effect. *See id.*

[¶ 18] Functional integration refers to transfers between, or pooling among, business segments that significantly affect the business operations of the segments. *See F.W. Woolworth Co.,* 458 U.S. at 364–66, 102 S.Ct. 3128; *Exxon Corp.,* 447 U.S. at 224–25, 100 S.Ct. 2109. Economies of scale result when integrated businesses gain advantages from an "umbrella of centralized management and controlled interaction." *Exxon Corp.,* 447 U.S. at 222, 224, 100 S.Ct. 2109.

[¶ 19] In particular, as part of the unitary business determination, a court must distinguish between connections that demonstrate integration and those that typify investment oversight. As the United States Supreme Court stated in *Container Corp.,* there must be "sharing or exchange of value not capable of precise identification or measurement" that exceeds "the mere flow of funds arising out of a passive investment or a distinct business operation." 463 U.S. at 166, 103 S.Ct. 2933.

[¶ 20] Gannett's affiliates, including those in the Cable Division, were functionally integrated in various ways. Gannett provided centralized tax, legal, internal audit, financial, and risk management services to all affiliates, which were billed "at cost." Gannett billed only for the labor

and overhead costs associated with providing the services. It determined the amount billed, with no opportunity for negotiation.

■ [¶ 21] As many courts have held, the provision of intercompany services that an independent business would ordinarily perform for itself, such as accounting, insurance, legal, tax, and financing, is a form of centralized management. *See, e.g., Earth Res. Co.*, 665 P.2d at 969–70; *Borden, Inc. v. Ill. Dep't of Revenue*, 295 Ill.App.3d 1001, 230 Ill.Dec. 169, 692 N.E.2d 1335, 1339–41 (1998). There is a flow of value that results from these services. Furthermore, the provision of these centralized services creates economies of scale and shows functional integration. *Citizens Utils. Co. of Ill. v. Dep't of Revenue*, 111 Ill.2d 32, 94 Ill.Dec. 737, 488 N.E.2d 984, 991 (1986).

[¶ 22] The overlap between Gannett's broadcast and cable groups as to some operational matters, including the sharing of expertise, resulted in additional integration. Further, legal services provided to the Cable Division by the general counsel of Gannett's Broadcasting Division created additional economies of scale and functional integration. *See Container Corp.*, 463 U.S. at 173 n. 9, 103 S.Ct. 2933 (the fact that parent company's employee negotiated a contract on behalf of the subsidiary was evidence of a unitary business); *Borden*, 692 N.E.2d at 1339–40.

[¶ 23] The centralized provision of health and benefit plans also provides evidence of a unitary business due to the resulting functional integration and economies of scale. *See, e.g., Pentzien, Inc. v. Neb. Dep't of Revenue*, 227 Neb. 434, 418 N.W.2d 546, 553 (1988). Gannett provided its common group health insurance plan, as well as its common auto, life, and property and casualty insurance policies, to

employees of both Gannett and the Cable Division.

[¶ 24] Centralization of management entails substantial participation and oversight by the management of the parent company in the operational decisions of the subsidiary. *Container Corp.*, 463 U.S. at 180 n. 19, 103 S.Ct. 2933. The inquiry focuses on "whether the management role that the parent does play is grounded in its own operational expertise and its overall operational strategy." *Id.* In *Container Corp.*, the taxpayer corporation's affiliates were engaged in their respective local markets in "essentially the same business" as the taxpayer. *Id.* at 171–72, 103 S.Ct. 2933. As a result, the taxpayer had technical and operational expertise that it could share with its affiliates. *See id.* at 173, 179, 103 S.Ct. 2933. As described above, Gannett shared the expertise of its management with all of its affiliates, including the Cable Division, in a variety of ways.

■ [¶ 25] A system of interlocking directors and officers is evidence of a unitary business because of the centralized management and functional integration that results. *See, e.g., Citizens Utils.*, 488 N.E.2d at 990; *In re Appeal of A.M. Castle & Co.*, 245 Kan. 739, 783 P.2d 1286, 1291 (1989). Gannett's CEO and CFO were the sole members of the boards of directors of each Gannett corporation involved in cable television, including the Cable Division. In addition, three of the Cable Division's officers held the same positions for all of Gannett's corporate affiliates.

[¶ 26] Gannett's cash management system, a common pool of cash from which any one of the more than 120 Gannett affiliates could draw (interest-free) to pay for capital expenses or for their operating systems, is further evidence that Gannett was a unitary business. Courts have held

that such a system creates economies of scale and functional integration. For example, in ruling that a unitary relationship existed in *Container Corp.*, the United States Supreme Court noted the "substantial role played by [the parent] in loaning funds to the subsidiaries and guaranteeing loans provided by others." 463 U.S. at 179, 103 S.Ct. 2933. The Court stated that the "resulting flow of value is obvious." *Id.* at 180 n. 19, 103 S.Ct. 2933. In addition, the Supreme Court of Illinois held that the use of a cash management system, which allows subsidiaries to readily access interest-free funds simply by making a telephone call, also results in a flow of value. *See Citizens Utils.*, 488 N.E.2d at 991.

[¶ 27] Therefore, the record provides ample undisputed material facts. Gannett's provision of intercompany services, the sharing of expertise among affiliates, its centralized health and benefit plans, the interlocking directors and officers, and its cash management system all support our conclusion that Gannett operated a unitary business.

2. Constitutional Distortion Analysis

■ [¶ 28] The State "may tax an apportioned sum of [Gannett's] multistate business if the business is unitary." *Allied–Signal*, 504 U.S. at 772, 112 S.Ct. 2251. However, there are constitutional limitations on state taxation of income generated by the interstate activities of a unitary business. *See Container Corp.*, 463 U.S. at 169, 103 S.Ct. 2933. For a state to proportionally tax income arising out of interstate activities, the Due Process Clause of the United States Constitution requires a minimal connection, or nexus between the taxing state and the interstate activities, as well as "a rational relationship between the income attributed to the State and the intrastate values of the enterprise." *Mobil Oil Corp. v. Comm'r of*

*Taxes*, 445 U.S. 425, 436–37, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980). In addition, the Commerce Clause requires any apportionment formula to be fair and to avoid gross distortion. *See Container Corp.*, 463 U.S. at 169–70, 103 S.Ct. 2933.

■ [¶ 29] Pursuant to the Due Process Clause, a court must determine "whether intrastate and extrastate activities formed part of a single unitary business or whether the out-of-state values that the State seeks to tax derived from unrelated business activity which constitutes a discrete business enterprise." *MeadWestvaco Corp.*, 128 S.Ct. at 1505 (quotation marks omitted). Here, the Assessor seeks to tax income derived from Gannett's sale of its Cable Division. The Due Process Clause requires us to consider whether the value of Gannett's activities in Maine and the income it received from the sale of the Cable Division were rationally related, and whether the relationship resulted in some sharing or exchange of value. *See Container Corp.*, 463 U.S. at 165–66, 103 S.Ct. 2933.

[¶ 30] In fact, Gannett's unitary business had extensive business in Maine in 2000, totaling approximately $26 million in sales, which included $22 million in Maine sales by Gannett's subsidiary Pacific & Southern, Inc., $2.75 million in sales by Gannett's corporate entity GANSAT, and $900,000 in USA Weekend, Inc., sales. Gannett's unitary business also owned or rented about $16 million in Maine property in 2000, $15 million of which was used by Pacific & Southern in connection with its operation of two television stations, WCSH–6 in Portland and WLBZ–TV in Bangor. Finally, Gannett's Maine payroll exceeded $7.4 million in 2000, most of which was for its broadcast television operations in Portland and Bangor.

[¶ 31] Gannett was also involved in the publication, sale, and distribution of *USA*

*Today* and *Baseball Weekly* by GANSAT in Maine and elsewhere. Gannett also distributed other publications in Maine. USA Weekend, Inc., published and sold the magazine *USA Weekend* to newspapers in Augusta, Bangor, Biddeford, Lewiston–Auburn, and Waterville. Times News Group, Inc., sold newspapers directed at members of the armed forces (such as *Army Times*) and advertised these newspapers in Maine and other states. Another Gannett subsidiary, Cape Publications, Inc., was a partner in a limited partnership that bought real estate in Maine in 1999. That real estate, in turn, was leased to Pacific & Southern for its Maine broadcast TV operations.

[¶ 32] In addition, Gannett's Maine activities were integrally related to its unitary business enterprise, thereby producing an exchange of value. For example, the operations of the Bangor and Portland television stations benefited from funds they received from the cash management system, to which the cable television operations contributed. The general counsel of Gannett's Broadcasting Division, whose legal services were available to the Bangor and Portland television stations from 1998 through 2000, also served as general counsel for the Cable Division at the same time. On a few occasions, the Cable Division's president "advised general managers" in Gannett's Broadcasting Division "regarding how the cable business person looks at a deal to help them negotiate deals for TV broadcasting." Finally, the Cable Division received input from Broadcasting Division managers on how to better negotiate deals with broadcasters.

[¶ 33] Gannett's activities in Maine were therefore significantly related to Gannett's unitary business. All of Gannett's operating components formed a functionally integrated corporation, which benefited from an exchange of value among those various components in Maine

and elsewhere. Maine's apportionment formula is therefore valid under the Due Process Clause.

[¶ 34] However, we must also consider, pursuant to the Commerce Clause, whether the apportionment formula is fair and avoids gross distortion. *See Container Corp.,* 463 U.S. at 169–70, 103 S.Ct. 2933. Accordingly, two factors must be considered. *Id.* at 169, 103 S.Ct. 2933. First, the apportionment formula must be internally consistent—"that is, the formula must be such that, if applied by every jurisdiction, it would result in no more than all of the unitary business' income being taxed." *Id.* Gannett does not raise this issue on appeal, and we therefore need not address it. Second, the Court will look to whether there is "external consistency"—that is, the State's apportionment formula "must actually reflect a reasonable sense of how income is generated." *Id.* A court "will strike down the application of an apportionment formula if the taxpayer can prove by clear and cogent evidence that the income attributed to the State is in fact out of all appropriate proportions to the business transacted in that State, or has led to a grossly distorted result." *Id.* at 170, 103 S.Ct. 2933 (quotation marks and alterations omitted). However, this standard of proof is a difficult one for the taxpayer to meet.

[¶ 35] The external consistency requirement allows a state to tax "only that portion of the revenues from the interstate activity which reasonably reflects the in-state component of the activity being taxed." *Goldberg v. Sweet,* 488 U.S. 252, 262, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989). External consistency is a pragmatic test, requiring us to examine "the in-state business activity which triggers the taxable event and the practical or economic effect of the tax on that interstate activity." *Id.* at 262, 264, 109 S.Ct. 582.

However, an apportionment formula is not invalid simply because some income, which did not have its source in the taxing state, may end up being taxed by that state. *Container Corp.*, 463 U.S. at 169–70, 103 S.Ct. 2933.

[¶ 36] Gannett's unitary business, which had substantial activity in Maine in 1999 and 2000, was much more profitable in 2000 than 1999 due to the sale of its Cable Division. Gannett's business benefited as a whole from the functional integration and exchange of value that its various components, including the Cable Division and Gannett's significant Maine operations, provided to each other. Maine's apportioned share of the larger amount of income in 2000, which amounts to approximately one-third of one percent, is not unreasonable or disproportionate. Accordingly, Gannett has failed to show by clear and convincing evidence the apportionment formula resulted in gross distortion.

The entry is:

Judgment vacated. Remanded to the Superior Court for entry of judgment in favor of the State Tax Assessor.