

# THE ATTORNEY GENERAL
## OF TEXAS

JIM MATTOX
ATTORNEY GENERAL

December 31, 1990

Honorable Bob Bullock
Comptroller of Public
    Accounts
L.B.J. Office Building
Austin, Texas 78774

Opinion No. JM-1280

Re: Gross receipts assessment for for telephone companies under sections 78 through 82 of article 1446c, V.T.C.S., the Public Utility Regulatory Act (RQ-2090)

Dear Mr. Bullock:

Sections 78 through 82 of article 1446c, V.T.C.S., the Public Utility Regulatory Act [hereinafter PURA], impose a regulatory fee on each public utility falling within the Public Utility Commission's [hereinafter PUC] jurisdiction for the purpose of defraying the costs and expenses incurred by the commission in the administration of PURA. The fee is calculated as a percentage of the gross receipts from rates charged by public utilities to ultimate consumers.

You ask a series of nine questions regarding the application of the gross receipts fee to telecommunications carriers operating in Texas. Specifically, you ask whether and under what circumstances the fee may be imposed upon certain telecommunications carriers, in light of the divestiture by American Telephone & Telegraph Company [hereinafter AT & T] of Bell operating companies imposed in an antitrust consent decree entered by order of the federal courts. Essentially, you wish to know which carriers are subject to the jurisdiction of the PUC and who is an "ultimate consumer" under certain circumstances for purposes of section 78 of PURA.

Section 78 of PURA imposes an assessment upon each "public utility" subject to the PUC's jurisdiction that is based upon the "rates" charged to the "ultimate consumers." Section 78 of PURA provides:

> An assessment is hereby imposed upon each public utility within the commission's jurisdiction, including interexchange telecommunications carriers, serving the ultimate consumer equal to one-sixth of one percent of its gross receipts from rates charged the ultimate consumers in Texas for the purpose

<u>of defraying the costs and expenses incurred in the administration of this Act</u>. Thereafter the commission shall, subject to the approval of the Legislature, adjust this assessment to provide a level of income sufficient to fund the commission and the office of public utility counsel. Any interexchange telecommunications carrier found dominant as to any service market under Section 100(b) or filing a petition under Section 100(f) of this Act shall be required to reimburse the Office of Public Utility Counsel for the costs of participation before the commission on behalf of residential ratepayers in any of the proceedings under Section 100 of this Act to the extent found reasonable by the commission. Recovery of costs under this section by the Office of Public Utility Counsel shall not exceed $175,000 per annum. <u>Nothing in this Act or any other provision of law shall prohibit interexchange telecommunications carriers who do not provide local exchange telephone service from collecting the fee imposed under this Act as an additional item separately stated on the customer bill as 'Utility Gross Receipts Assessment'</u>. (Emphasis added.)

You first ask:

What telephone companies should be paying this assessment -- does it apply to all telephone companies which may be subject to any facet of the PUC's jurisdiction, whether for rate making purposes or for more limited purposes?

You inform us that you have advised all "long distance telephone companies" that they fall within the reach of section 78 and are thereby subject to the assessment, but that several carriers disagree with your construction. We assume that there is no question that local exchange carriers (known as LECs) who provide local services to residential and business subscribers fall within the ambit of the act. We assume that, with the phrase "long distance telephone companies," you refer to interexchange carriers (known as IXCs) that offer either interLATA or intraLATA long distance service. You state that the PUC has failed to take any consistent position on whether the assessment applies to all carriers subject to any facet of its jurisdiction or just to "dominant carriers" as defined in section 3(c)(2)(B) of PURA. It is suggested that section 78

reaches only those carriers over which the PUC has ratemaking authority.  We disagree.

In Attorney General Opinion H-811 (1976), this office was asked, _inter alia_, whether section 78 reached only those utilities over which the PUC had ratemaking authority or whether it extended to any utility over which it exercised any type of jurisdiction.  The opinion concluded:

> The quoted language of section 78 is unqualified.  Consequently, the Commission need not exercise any particular form of jurisdiction over a utility in order to assess the utility.  In our view, the term 'Commission's jurisdiction' may best be defined by reference to article III of the Act, entitled 'Jurisdiction.'  Therein the Commission is given jurisdiction over various utilities.

The relevant language of section 78 has not been amended since the issuance of Attorney General Opinion H-811, except for the addition of the phrase "including interexchange carriers."

Any doubt as to whether section 78 now reaches all interexchange carriers is resolved by examining the legislative history for Senate Bill No. 229, which was enacted in 1987.  Prior to the enactment of that bill, section 78 provided that the assessment was "imposed upon each public utility within the commission's jurisdiction serving the ultimate consumer."  The bill added the phrase "including interexchange telecommunications carriers."  Acts 1987, 70th Leg., ch. 414, § 3 at 1950.  Moreover, the bill amended subsections 3(c) and 18 (c) and (d) of PURA, which had effectively provided that IXCs other than AT & T were not "public utilities" for purposes of section 3 and not subject to the PUC's jurisdiction under section 18.  Subsequent to the enactment of Senate Bill 229, IXCs other than AT & T became "public utilities" for purposes of conferring limited jurisdiction over them on the PUC.

The "Background" section of the bill analysis for the bill provides:

> Current Texas law requires a public utility to submit to the jurisdiction of the Public Utility Commission (commission).  There are now at least 70 interexchange telecommunications carriers operating in the state that do not fall under the definition of a public utility because they do not provide local

> exchange telephone service. Because they do not fall in the category of a public utility, they are not subject to regulations that carriers who provide local telephone service are subject to. <u>For example, carriers who provide local exchange telephone service must pay one-sixth of one percent of the gross receipts from rates charged consumers to the PUC, which is used to defray the expenses incurred in running the commission</u>. (Emphasis added.)

Bill Analysis, S.B. 229, 70th Leg. (1987).

The "Purpose" section of the bill analysis stated:

> As proposed, S.B. 229 amends the Public Utility Regulatory Act by making interexchange telecommunications carriers public utilities, thereby placing them under the jurisdiction of the Public Utility Commission. S.B. 229 also requires that the long distance rates be averaged statewide and that long distance carriers not discontinue service to any area of the state without permission of the PUC.

And finally, the "Section by Section Analysis" portion of the bill analysis described the bill in the following way:

> SECTION 1.  Amends Section 3(c), Public Utility Regulatory Act (PURA), Art. 1446c, V.T.C.S., to define a public utility as it affects telecommunications. Provides for the term 'interexchange telecommunications carriers' to be substituted for the terms 'specialized communications common carriers' and 'resellers of communications and other common carriers.' <u>Provides that the commission's jurisdiction over those interexchange telecommunications carriers who do not provide local exchange telephone service will be limited to the extent defined in PURA</u>. Strikes from the amendment to the definition of a public utility any reference to the term 'dominant carrier' as defined in Section 3(c)(2)(b).
>
> SECTION 2.   Amends Sections 18(c) and (d), PURA, Art. 1446c.

<u>Subsection (c) provides specific jurisdic-
tion of the commission over 'interexchange
telecommunications carriers who do not pro-
vide local exchange telephone service.</u>'   Re-
moves the reference to 'dominant carriers.'
Provides for the commission to conduct in-
vestigations regarding competition in the
industry.

(c)(4) Requires the commission to maintain
statewide average rates or prices of message
telecommunications service.

(c)(5) <u>Authorizes the commission to re-
quire that interexchange telecommunications
carriers may not abandon or discontinue
message telecommunications service in or to a
local exchange area unless the commission
specifically so orders</u>.

(d) Provides that an interexchange tele-
communications carrier must maintain its
tariffs or service lists on file with the
commission.

SECTION 3.   <u>Amends Section 78, PURA, Article
1446c, V.T.C.S., to require that inter-
exchange telecommunications carriers be
included among those public utilities that
must support the Public Utility Commission
through an assessment of one-sixth of one
percent of their gross receipts</u>.   (Emphasis
added.)

We conclude that, with the enactment of Senate Bill 229
in 1987, the legislature clearly intended to confer juris-
diction, however limited, to the PUC over all interexchange
common carriers.   Therefore, we conclude that the section 78
assessment reaches all local exchange carriers and all
interexchange carriers operating in Texas.

Your second question asks:

Are local access charges subject to the as-
sessment?

Section 78 imposes an assessment that is calculated on
the basis of the "rates charged the ultimate consumer."   The
phrase "ultimate consumer" is not defined anywhere in PURA,
but the term "rate" is.   Subsection (d) of section 3 of PURA
defines "rate" and provides:

> The term 'rate,' when used in this Act,
> means and includes every compensation, tar-
> iff, charge, fare, toll, rental, and classi-
> fication, or any of them demanded, observed,
> charged, or collected whether directly or
> indirectly by any public utility for any
> service, product, or commodity described in
> Subdivision (c) of this section, and any
> rules, regulations, practices, or contracts
> affecting any such compensation, tariff,
> charge, fare, toll, rental, or classifica-
> tion.

End user access charges exacted upon residential and business subscribers by an LECs or IXC are "rates charged to the ultimate consumer" for purposes of the regulatory assessment imposed by section 78 of PURA. You ask whether interexchange carrier access charges received by an LEC from an IXC are "rates charged to the ultimate consumer." That they fall within the definition of "rate" is clear. The issue is whether the interexchange carrier, in paying an access charge to a local exchange carrier is, an "ultimate consumer."

Prior to the divestiture, charges analogous to those about which you ask were held by the PUC not to fall within the section 78 assessment. In Docket 2054, 23 P.U.C. Bull. vol. IV, No. 23, 2074 (1979), the PUC held that charges imposed upon telegraph companies for access services provided by local telephone exchange companies were not charges imposed upon the "ultimate consumer." See also Attorney General Opinion H-811.

You suggest that that administrative holding is no longer controlling because of the court-ordered divestiture. You suggest that, because the Bell operating companies are restricted primarily to providing local exchange services and access to their local systems to interexchange carriers, while interexchange carriers are prohibited from providing local exchange service, an interexchange carrier is an "ultimate consumer" of the services provided to them in the identical way that residential and business subscribers are ultimate consumers of the services provided to them. For two reasons, we disagree.

First, words ordinarily are given their plain meaning, unless the statute clearly shows that they were used in some other sense. Big H Auto Auction, Inc. v. Saenz Motors, 665 S.W.2d 756 (Tex. 1984); Taylor v. Firemen's & Policemen's Civil Service Comm., 616 S.W.2d 187 (Tex. 1981). The ordinary meaning of the phrase "ultimate consumer" refers to someone who is last in the chain of sale or use. See, e.g.,

Alco. Bev. Code §§ 16.01, 16.05, 64.01; Nat. Res. Code § 113.081(a)(4). The final consumer in the chain created when someone makes a long distance telephone call is the residential or business subscriber who initiates the call.

There are three essential components of any long distance telephone call. First, the calling party places a call through the facilities of an LEC serving his area. Second, the originating LEC connects the call to an IXC that transports the call to its destination. Third, the IXC accesses the local network of the destination LEC to complete transmission of the call to its destination. See National Ass'n of Reg. Util. Comm'rs v. F.C.C., 737 F.2d 1095 (D.C. Cir.), cert denied, 469 U.S. 1227 (1984). The interexchange access charge is imposed upon the interexchange carrier by both local exchange companies. These charges comprise part of the rate that interexchange carriers impose upon their customers. In effect, the access is "resold," as it were, by the interexchange carrier to its customer. That the legislature understood that access by an IXC to local exchange companies is a resold service to the residential or business subscriber is evidenced by the legislative history of the statute that added section 151.323 of the Tax Code.[1] This provision exempts telecommunications services from the reach of the sales and use tax. See Bill Analysis, H.B. 1949, 69th Leg. (1985).

Second, the section 78 assessment is imposed upon the interexchange carriers' gross receipts from its subscribers, which includes the charges passed through to their customers to recoup the access charges paid to local exchange carriers. If we were to conclude that interexchange carriers were "ultimate consumers" for purposes of the imposition of the interexchange carrier access charge, that charge would be included twice in the total assessment imposed upon the telecommunications industry. There is no indication that the legislature intended such a result.

--------

1. Section 151.323 of the Tax Code provides in part:

There are exempted from the taxes imposed by this chapter the receipts from the sale, use, or other consumption in this state of:

. . . .

(3) access to a local exchange telephone company's network by a regulated provider of telecommunications services. . . .

Your third, fourth, fifth, sixth, and seventh questions are as follows:

> If Question Two is answered 'yes', are local access charges subject to the assessment on calls from:
>
> (3) a point in Texas to another point in Texas in a different LATA;
>
> (4) a point in Texas to another state;
>
> (5) a point in another state to a point in Texas;
>
> (6) a point in Texas to another country; and
>
> (7) a point in another country to a point in Texas?

Because of our answer to your second question, we need not address your third through seventh questions.

Your eighth question asks:

> Under the Supreme Court case of Goldberg v. Sweet, 488 U.S. 252, 109 S. Ct. 582, 102 L.Ed.2d 607 (1989), it is clear that Texas could constitutionally impose this assessment on the long distance portion of a call that originates in or is received in Texas so long as the call is billed to a Texas address. Should the assessment on long distance calls be based on the formula approved by the court in Goldberg v. Sweet or, if not, what formula should be used?

In Goldberg v. Sweet, 488 U.S. 252 (1989) the United Supreme Court held that the Illinois Excise Tax, which imposed an excise tax on interstate calls that separated local exchange costs from the costs associated with the actual use of the interstate interexchange carrier's line, did not violate the commerce clause of the United States Constitution. The Illinois statute imposed a five percent tax on the gross charge of interstate telecommunications originated or terminated in Illinois and charged to an Illinois service address regardless of where the telephone call is billed or paid. The statute imposed an identical five percent tax on intrastate telecommunications. In order to prevent actual multi-state taxation that would be violative of the commerce clause of the United States Consti-

tution, the statute provided a credit to any taxpayer that has paid a tax in another state on the same telephone call that triggered the Illinois tax.

We do not understand you to ask whether you may promulgate administrative rules that would permit you to administer the section 78 assessment charge in a way that comports with the holding of Goldberg. We understand you to ask whether any rules so drafted would be constitutional. You have not submitted to us any specific proposed rules; therefore, any discussion by this office of any hypothetical formula would be speculative. This office does not answer hypothetical questions in the opinion process. Therefore, we decline to answer your eighth question.

Your ninth question asks:

> Does the assessment apply to activities such as 'billing and collection services' performed by local exchange companies on behalf of, and billed to, long distance telephone companies?

The definition of "rate" set forth in section 3 of PURA includes "services." Subsection (s) of section 3 of PURA defines "service" and provides:

> 'Service' is used in this Act in its broadest and most inclusive sense, and includes any and all acts done, rendered, or performed and any and all things furnished or supplied, and any and all facilities used, furnished, or supplied by public utilities in the performance of their duties under this Act to their patrons, employees, other public utilities, and the public, as well as the interchange of facilities between two or more of them. Service shall not include the printing, distribution, or sale of advertising in telephone directories.

Billing and collection services clearly fall within the definition of "services" and "services" falls within the definition of "rate." However, the section 78 regulatory fee may be imposed only on those "rates" charged to "ultimate consumers." We assume that these service charges are passed through to the IXC's subscribers. Because of our answer to your second question, we answer your ninth question in the negative.

## S U M M A R Y

The assessment  imposed by  section 78  of article 1446c, V.T.C.S.,  the Public  Utility Regulatory Act, reaches all public  utilities subject to the jurisdiction of the act.   In-terexchange  carriers   are   not   "ultimate consumers" for purposes of section 78, if the local access  charges are  passed through  to their subscribers.

Very truly yours,

J I M   M A T T O X
Attorney General of Texas

MARY KELLER
First Assistant Attorney General

LOU MCCREARY
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY
Special Assistant Attorney General

RENEA HICKS
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Jim Moellinger
Assistant Attorney General