Richmond

COMMONWEALTH NATURAL RESOURCES, INC.,
CNG TRANSMISSION COMPANY
AND
ALLIED CHEMICAL CORPORATION
v.
COMMONWEALTH OF VIRGINIA AND STATE
CORPORATION COMMISSION

November 22, 1978.

Records Nos. 771193 and 771842.

Present: All the Justices.

*John W. Riely (H. Brice Graves; Vincent D Sapp; A. C. Epps; Charles F. Midkiff; Hunton & Williams; Christian, Barton, Epps, Brent & Chappell, on brief), for appellants.*

*Richard D. Rogers, Jr.; Lewis S. Minter (Edward L. Flippen, on brief), for appellees.*

I'ANSON, C.J., delivered the opinion of the Court.

This is an appeal by Commonwealth Natural Gas Corporation (CNG),[1] from two orders of the State Corporation Commission (Commission) entered on June 10, 1977 and December 7, 1977, respectively, denying in part CNG's application for a refund of franchise taxes assessed on gross receipts and special taxes. The taxes in issue here are those imposed and paid under protest in 1976 on CNG's 1975 gross receipts on its sales of natural and synthetic natural gas to Allied Chemical Corporation (Allied). Allied was permitted to intervene in the hearing before the Commission.

CNG was organized in 1947 under the laws of Virginia as a public service corporation. At that time, CNG was subject to the jurisdiction of the Federal Power Commission (FPC). It received a certificate from the FPC authorizing it to construct a pipeline from a point near Stanardsville in Greene County to a point in the city of Norfolk, wholly within this State.

---

[1] On February 28, 1977, subsequent to the filing of CNG's application, the name of CNG was changed to Commonwealth Natural Resources, Inc., and on the same day its pipeline properties were sold to a new corporation, CNG Transmission Company. These transactions account for the difference between the style of the case here and before the Commission.

In 1954, the Natural Gas Act was amended by Congress (Hinshaw Bill, 15 U.S.C. § 717(c)) removing from the jurisdiction of the FPC natural gas pipelines that were located within the boundaries of a single state and acknowledging regulation by the state in which such lines were located.

Following passage of the Hinshaw Bill, the State Corporation Commission assumed jurisdiction over facilities of CNG, its terms and conditions of service, except sales to Allied (and municipalities exempt under Code § 56-232). The exception for Allied was predicated upon representations made to the Commission's General Counsel that all gas sold to Allied would be used as a raw product in a manufacturing process and that none of the gas would be used for heat, light or power. Based upon this understanding, the Commission determined that such gas sales between Allied and CNG were not subject to regulation by the Commission. Consequently, all CNG's sales to Allied were based on negotiated contracts between the parties, rather than regulated tariffs.

On April 1, 1954, the Commission granted CNG a certificate of public convenience and necessity. The certificate authorized the operation of the facilities previously approved by the FPC, and further authorized CNG to "furnish public utility service within Virginia to customers adjacent to said transmission line." The certificate also specifically authorized the gas transmission line and its facilities to serve Allied.

CNG purchases most of the natural gas it transmits from two companies having interstate pipelines passing through the state. Since 1974, some additional gas has been produced by CNG at its synthetic natural gas plant and transmitted through its pipeline facilities. The synthetic natural gas is produced from liquid propane and liquid butane imported by CNG to a marine terminal adjacent to its Chesapeake plant.

CNG sells gas for resale to the city of Richmond (exempt from Commission regulation by Code § 56-232), and to four gas distributing companies. CNG also sells gas to Virginia Electric and Power Company (VEPCO) for the operation of two electric generating installations. From April 1954 to April 1976 Allied purchased gas from CNG.

Occasionally Allied purchased gas from supplemental sources which was then transferred or transported by CNG as agent for Allied under a transportation tariff as distinguished from a sales tariff. No sale of gas by CNG to Allied occurs with respect to these transfers.

Allied has used a substantial portion of the natural gas purchased from CNG as a feedstock, rather than as a fuel. The gas is used in the integrated production by chemical processes of caprolactam and ammonium sulphate (the latter being sold as agricultural fertilizer in Virginia, other states, and foreign countries). Allied has also used the gas in the production of ammonia. This process is so sensitive that temperature must be rigidly controlled.

In 1975 Allied disclosed for the first time that part of the gas sold to it by CNG from the beginning of such sales in 1954 had been used for heat in the ammonia production process. The figures presented for the years 1961 through 1975 show the percentage of gas used for heat ranged from 43% to 23%.

Before 1976 CNG never reported any of the gross receipts from supplying gas to Allied as subject to the franchise tax on gross receipts imposed by Code § 58-597. In 1976 at the specific direction of the Public Service Taxation Division of the Commission, CNG reported 10% of its gross receipts from supplying gas to the Allied plant in the years 1972 through 1974. The Taxation Division attributed that percentage to the critical temperature control process involved in the production of ammonia. Also, gross receipts derived from all gas sales to Allied during 1975 were reported to the Taxation Division's director.

In 1976 the Commission assessed taxes only on 10% of CNG's gross receipts for the years 1972 through 1974 because the parties conceded that at least 10% of the gas sold to Allied during that period had been used for heat, it was assumed that the remainder was used by Allied as a feedstock to produce chemicals.

The taxes assessed by the Commission against CNG in 1976 on its gross receipts for the year 1975 were based upon gross receipts from all sales of gas to Allied without regard to its use. The franchise tax and the special tax assessed against CNG on gross

receipts for the year 1975 amounted to $400,581.95, of which $391,829.59 pertained to all gas sales to Allied, including synthetic natural gas.

CNG and Allied contend:

(1) That CNG is not obligated to pay the franchise tax based on gross receipts received from its sales to Allied or is exempt:

(a) because the tax is levied only on gross receipts "derived from the business of distributing and selling natural gas in this State" (Code § 58-597) and, contrary to the Commission's finding, it is not engaged in the business of distributing and selling natural gas to Allied; or in the alternative,

(b) to the extent that the gas is used by Allied as a raw material and not to produce heat, the franchise tax is inapplicable because it is levied only on corporations "furnishing water or heat, light and power" (Code § 58-602);

(2) That the gross receipts from sales of manufactured (synthetic) gas should not be included in the tax base since the tax is imposed only on gross receipts derived from selling "natural gas";

(3) That the Commission improperly imposed retroactively the tax on 1975 gross receipts when it did not assume any jurisdiction over sales to Allied until January 1976; and

(4) That the Commission was incorrect in imposing the special tax (Code § 58-661) on receipts received after February 11, 1976, from all sales and transfers of gas by CNG to Allied.

The issues presented involve principally the interpretation of Code §§ 58-597 and 58-603.

Code § 58-597, in pertinent part, provides that pipeline transmission companies "shall pay the State franchise tax on gross receipts imposed by § 58-603 to the extent that its receipts are derived from the business of distributing and selling natural gas in this State."

Code § 58-603 levies a franchise tax on corporations engaged in the business of furnishing water or heat, light and power whether by means of electricity or gas (Code § 58-602). Code § 58-603 also

provides that water or heat, light and power companies "shall pay to the State for each tax year an annual State franchise tax. . . of its gross receipts from all sources. . . ."

CNG argues that it is not distributing natural gas to Allied because the word "distribute" as defined by Webster's Third New International Dictionary, means "[t]o divide among several or many. . . ." It thus asserts that since Allied is its only customer consuming the gas sold to it except an insignificant amount CNG sells to VEPCO for use in firing combustion turbines, it is not engaged in the business of distributing and selling gas for heat, light and power. Hence, it concludes that since the word distribute means delivery to a number of utilities, not just one or two, it is not engaged in the business of distributing and selling gas to Allied within the intendment of Code § 58-597.

CNG also relies upon *Memphis Gas Company* v. *McCanless*, 180 Tenn. 688, 177 S.W.2d 841 (1944), and *Utilities Natural Gas Co.* v. *State*, 133 Tex. 313, 128 S.W.2d 1153 (1939), as authority for the proposition that a sale to one or two customers does not constitute distribution.

Neither case relied upon presents the same issue involved herein. Each is clearly distinguishable under the facts from the case at bar.

Moreover, the Tennessee Supreme Court in *Tennessee Natural Gas Line, Inc.* v. *Atkins*, 199 Tenn. 468, 476-77, 287 S.W.2d 67, 70 (1956), a case not cited in either brief, distinguishes *McCanless, supra*, on the facts. *Atkins* involved a natural gas transmission company which operated entirely within the state. The corporation was engaged in buying natural gas from an interstate pipeline company and reselling a portion of that gas to a large industrial user in the state as well as to a wholly owned subsidiary corporation which sold gas to consumers in the state. The court held that the complainant was liable for taxes assessed under a gross receipts taxing statute which imposed a gross receipts tax on complainant's intrastate sales to the industrial consumer. The Tennessee statute and the facts in that case were quite similar to the statutes and facts involved in the case at bar.

■ We do not agree with CNG's contention that there must be distribution of gas to more than one or two customers to render it liable for the franchise tax on its gross receipts. Such interpretation of the word "distribute" can only be reached by singling out and giving the word "distributing" the one meaning contended by the appellants; whereas it has many other meanings. A cardinal rule of statutory construction is that a statute be construed from its four corners and not by singling out a particular word or phrase. Code § 58-597 provides that a pipeline transmission company "shall pay the State franchise tax on gross receipts imposed by § 58-603 *to the extent* that its receipts are derived from the business of distributing and selling natural gas." (Emphasis added.) The language of the statute clearly shows that the legislature intended to impose the tax on the pipeline transmission company distributing and selling natural gas to local trade for heat, light or power without reference to the number of users or customers the company may have or the amount or volume of the business done. Since CNG sells gas to Allied, part of which is used for heat, the mandate of Code § 58-597 requires payment by CNG of "the State franchise tax on gross receipts" imposed by Code § 58-603.

■ Allied alternatively contends that to the extent the gas is used by Allied as a raw material and not to produce heat, the franchise tax is inapplicable because the tax is levied only on corporations "furnishing water or heat, light and power." We do not agree.

We find nothing in § 58-597 or in § 58-603 which permits, or requires, the assessment of only a portion of the gross receipts derived from distributive sales. Nothing in either § 58-597 or § 58-603 purports to limit the tax to revenue from sales for a specific use. To the contrary, once it is established that the corporation is engaged in the business of furnishing electricity or gas for heat, light or power (Code § 58-602), § 58-603 imposes the tax upon the corporation's gross receipts from *all* sources. The sole limitation is that the receipts be derived from business in this state.

■ CNG argues that no franchise tax should be imposed on its gross receipts from the sales of synthetic natural gas (SNG) because Code § 58-597 imposes the franchise tax only on gross receipts derived from distributing and selling natural gas.

On the other hand, the Commonwealth and the Commission argue that if CNG's position is valid, it would appear that CNG lacked authority to transmit, distribute or sell anything other than

natural gas; and that since CNG has chosen to supplement its transmission and distribution, SNG should be treated in all respects as natural gas.

No specific definition of the term "natural gas" is found in Title 58 of the Code, but the distinction between natural and manufactured gas has been recognized by the General Assembly. For example, in the Utility Facilities Act, the definition contained in § 56-265.1(b) states:

> " 'Public utility' means any company which owns or operates facilities within the Commonwealth of Virginia for the generation, transmission or distribution of electric energy for sale, for the production, transmission, or distribution, otherwise than in enclosed portable containers, of *natural or manufactured* gas for sale for heat, light or power, or for the furnishing of telephone service, sewerage facilities or water. . . ." (Emphasis supplied.)

Section 2(5) of the Natural Gas Act, 15 U.S.C. 717a(5), defines "natural gas" as "either natural gas unmixed, or any mixture of natural and artificial gas."

The liquid hydrocarbons feedstock consisting of propane and butane shipped to CNG's plant were transformed into synthetic natural gas (SNG) by a chemical process. There is nothing in the record from which we can conclude that the SNG was mixed with natural gas so that it would fall within the definition of natural gas. "The product resulting from this molecular rearrangement" is manufactured gas and not natural gas. *See Public Service Com'n of State of N.Y.* v. *F. P. C.*, 543 F.2d 392, 394 (D.C. Cir. 1976).

If it was the intent of the General Assembly to impose a franchise tax on gross receipts derived from the distribution and sale of synthetic natural gas, it had the opportunity to include synthetic natural gas in the language of Code § 58-597.

We held in *Commonwealth* v. *Appalach. El. Power Co.*, 193 Va. 37, 46, 68 S.E.2d 122, 127 (1951), that "it is well-settled and familiar law that statutes imposing taxes are to be construed most strongly against the government, and in favor of the citizen, and are not to be extended by implication beyond the clear import of the language used. Whenever there is a just doubt, 'that doubt should

absolve the taxpayer from his burden.'" *See also Bott* v. *Common-wealth,* 187 Va. 745, 751, 48 S.E.2d 235, 238 (1948).

In the present case, there is no clear legislative intent to impose a franchise tax on gross receipts from the sales of synthetic natural gas to Allied. The tax cannot be extended by implication. Thus, we hold the franchise tax[2] was improperly assessed and levied on CNG's 1975 gross receipts on its sales of synthetic natural gas to Allied.

■ CNG contends that it was unfair and inequitable for the Commission to impose retroactively the tax on its 1975 gross receipts when it did not assume any jurisdiction over gas sales to Allied until January 1976. We do not agree.

Code § 58-1162 provides for the assessment of state taxes upon property subject to taxation, but which went untaxed for "any tax year of the three years last past."

Here the franchise tax on gross receipts was assessed when the Commission assumed jurisdiction over the distributive gas sales to Allied after it was made aware that a part of the gas sold by CNG to Allied was being used for heat since the inception of such sales in 1954. The Commission had not previously assumed jurisdiction of the sales because of a misunderstanding that the gas supplied Allied would be used as feedstock to produce chemicals and no part of the gas would be used for heat. The fact that the Commission did not assume jurisdiction until January 1976 did not preclude it from exercising the power and jurisdiction over sales to Allied under the facts and circumstances involved here.

CNG was under a duty to report annually to the Commission its gross receipts on its sales of gas used for heat. Code § 58-607. Although the record shows' that CNG's annual report to the Commission showed its gross receipts from sales of gas to VEPCO which were used to generate heat, light or power, it did not report its gross receipts on gas sold to Allied for heat until directed to do so by the Commission.

---

[2] We note that Code § 58-597 also provides that Pipeline Transmission Companies shall pay to the State the income tax imposed by Code § 58-151.01, *et seq.,* and if the company is liable for the franchise tax imposed by § 58-603 it shall not be liable for the franchise tax imposed by § 58-456.

Pursuant to Code § 58-1162, the assessment made in 1976 against CNG on its gross receipts of sales to Allied for the year 1975 was for omitted taxes. Under the facts here, the levying of the tax on gross receipts for 1975 was neither unfair nor inequitable, nor was the assessment imposed retroactively.

■ The Commission concedes that its order of June 10, 1977 stating that "we find no objection to the assessment and collection of special taxes upon such receipts [which included revenue from transfers][3] subsequent to our order of February 11, 1976" was erroneous. Special taxes [4] are assessed only on gross receipts from *sales* of gas. The Commission's erroneous order of June 10, 1977 would have included gross receipts derived by CNG for acting as Allied's agent in transporting gas purchased from another (*i.e.*, "transfers"). The Commission's December 7, 1977 order, which provided for refunds to CNG due to certain erroneous assessments, also carried the erroneous statement that "the collection of Special Taxes upon such receipts [which included *transfers*] subsequent to the Commission Order of February 11, 1976, . . . is proper."

For the reasons stated, the judgment of the Commission is affirmed in part, reversed in part, and remanded for the entry of an order not inconsistent with this opinion.

*Affirmed in part,*
*Reversed in part,*
*and Remanded.*

---

[3] The transfers referred to relate to receipts derived by CNG for acting as Allied's agent in transporting gas purchased by Allied from other gas companies. No *sale* by CNG to Allied was involved.

[4] Code § 58-661.