Present:  Kinser, C.J., Lemons, and Mims, JJ., and Carrico, Russell, Lacy, and Koontz, S.JJ.*

FORD MOTOR CREDIT COMPANY

OPINION BY
v.  Record No. 092158          CHIEF JUSTICE CYNTHIA D. KINSER
March 4, 2011
CHESTERFIELD COUNTY

FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Michael C. Allen, Judge

In this appeal, Ford Motor Credit Company (FMCC) challenges the assessment of Business, Professional and Occupation License (BPOL) taxes by Chesterfield County (the County) on the gross receipts that the County attributed to a branch office of FMCC located in the County (the Richmond Branch) for the tax years 2001 through 2004.  The Court must determine whether the circuit court erred in holding that the County included in the taxable measure only those gross receipts attributable to the exercise of the licensed privilege at a definite place of business in the County.  Because the Court concludes that the circuit court so erred, we will reverse its judgment for the County.

MATERIAL FACTS AND PROCEEDINGS

Pursuant to Code §§ 58.1-3702 and -3703(A), and Chesterfield County Code § 6-4, the County levied BPOL taxes against FMCC in the amounts of $327,137.85, $306,435.65,

---

* Justice Koontz presided and participated in the hearing and decision of this case prior to the effective date of his

$432,620.96, and $449,740.59 for the tax years 2001, 2002, 2003, and 2004, respectively.  In February 2007, following the County's 2004 denial of FMCC's request for a partial refund of BPOL taxes paid for the years in question, FMCC filed in the circuit court an "Application for Correction of Erroneous Assessment of Business, Profession[] and Occupation License Tax," seeking a refund of BPOL taxes in the amount of $1,515,935.05.[1]  See Code § 58.1-3984.  Citing Code § 58.1-3703.1(A)(3)(a)(4) and (A)(3)(b), FMCC alleged that, in the foregoing years, it had "mistakenly paid BPOL tax[es] to [the] County on the entire gross receipts of loans related to its Richmond Branch," instead of apportioning the receipts "to reflect the limited contribution of the Richmond Branch to [FMCC's] nationwide business."  FMCC asserted that the assessments violated the attribution requirement of Code § 58.1-3703.1, the deduction requirement of Code § 58.1-3732(B)(2), and the Commerce Clause's fair apportionment requirement.  Cf. U.S. Const. art. I, § 8.

The material facts are uncontested.  FMCC is a subsidiary of Ford Motor Company and is headquartered in Dearborn,

retirement on February 1, 2011; Justice Kinser was sworn in as Chief Justice on February 1, 2011.

[1] FMCC initially filed its application in 2004, but subsequently nonsuited that action.  It refiled the application in 2007.

2

Michigan.  It is a "financial services provider, primarily to the automobile purchase or loan lessee environment," but it also "finance[s] dealer floor plan[s]" and "dealer capital loans."[2] The capital necessary to make loans originates from FMCC headquarters in Michigan, as do the policies and criteria governing loan approval, contract terms, and other management issues.

Until its closing in 2007, the Richmond Branch was one of FMCC's 300 sales branches and, at one time, was one of three operating in the Commonwealth.  Approximately 75 percent of the Richmond Branch's business was "retail and lease contracts from dealerships," generally referred to as consumer financing for the purchase of vehicles, but its business also included FMCC's other revenue-producing activities:  "floor plan loan financing and dealership loan financing."[3]  The Richmond Branch was tasked with contacting and training dealers to increase vehicle sales and the number of loans made by FMCC, approving loan applications, determining loan interest rates, and providing

---

[2] FMCC also had a division called "Primus" that provided loans for the purchase of "non-Ford vehicles."  There were only "negligible differences" between the way FMCC and Primus operated at the branch level.

[3] "Dealership loan financing," also referred to as "dealer capital loans," involved financing for physical plant improvements and dealership property acquisitions.

programs and training for dealers concerning FMCC's financing programs.

During the period in question, the Richmond Branch reported to a regional office in Chantilly, Virginia, while offices in Baltimore, Maryland;[4] Nashville, Tennessee; Omaha, Nebraska; Mesa, Arizona; and Livonia, Michigan also played a role in managing and administering loans that originated in FMCC's Richmond Branch.  The Chantilly office managed all the branches within the region and approved certain larger loan amounts, such as dealer floor plan financing.  The Baltimore office operated as a "service center[]" and was responsible for processing loan payments to insure that customer payments were credited to the correct account, maintaining customer contact records, working with customers on late payments and refinancing, and handling the titling of vehicles when loans were initially made and then paid in full.  The Baltimore service center did "the bulk of the work" that went into ensuring receipt of monies from loans closed by the Richmond Branch.  The Nashville office was also a service center, but handled Primus loans exclusively as the headquarters of FMCC's Primus division.  Some Primus loans were processed through FMCC's Richmond Branch.  Finally, the service

---

[4] The Baltimore service center is located in Columbia, Maryland and is alternatively referred to as the Columbia service center.

4

center located in Omaha, Nebraska "handle[d] overflow business only."

FMCC also had centers that dealt with loans originating in the Richmond Branch, and elsewhere, that subsequently went into default. One such office in Mesa, Arizona, "the national recovery service center," was responsible for "ensur[ing] that [FMCC] obtain[ed] payment for any loans or leases that [were] in default." Its objective was to "get all the monies due [FMCC] under the loans or the leases." The other collection office that served the Richmond Branch was the Livonia office, which housed "the bankruptcy specialists." All the loan receivables "managed by FMCC [were] the receivables owned by FMCC."

With regard to the installment financing of vehicle purchases, the Richmond Branch reviewed loan applications from customers who sought to "purchase or lease a vehicle" from a Ford Motor Company dealership, and decided "whether or not to approve the loan . . . based on procedures set out by [FMCC headquarters in] Dearborn." The Richmond Branch also determined interest rates, sometimes approving a lower rate for a customer with a good credit score. However, most of the interest rates were set by the headquarters in Michigan. When the Richmond Branch approved a loan application, it notified the dealership, where the customer actually executed the installment loan contract. After the documents were signed and returned to the

5

Richmond Branch, it collected "all the paperwork" and forwarded the documents to a service center, which "then t[ook] over the duties of . . . get[ting] the title for the vehicle" and "maintain[ing] the loan."  When a "contract package [came back] into the branch," information was entered into a database, an activity that signaled the headquarters in Michigan "to wire funds electronically . . . to the dealership's bank account." The money was used to finance either the customer's purchase or, in the case of a lease, FMCC's purchase of the vehicle from the dealership.

The process of deciding whether to approve a loan application, and then processing an approved application and completed loan usually took "20 to 30 minutes for one application for one customer," while the "standard Ford Credit loan or lease usually stay[ed] on the books right at 30 months." The entire process "from the time that the loan application [came] in until the time the paperwork [was] completed and shipped out" took "three days to a week."  After "the packet of documents [was] sent off," the Richmond Branch had no further involvement with the loans.  The Richmond Branch did not process funds, receive payments, engage in collection or other customer service activities, or handle delinquent debts.  During the years in question, the Richmond Branch processed "around 20,000 [retail loans and leases] a year."

The Richmond Branch performed similar activities with respect to "floor plan financing," with rates and approval guidelines set by, and money sent from, FMCC's headquarters. But, the regional office and headquarters exercised a greater degree of control over how much money was loaned to a particular dealer. Once such a loan was approved, the Richmond Branch's "responsibilities were limited to auditing the [dealer's] inventory" and occasionally facilitating inventory trades between dealerships.

Likewise, the Richmond Branch's role as to "dealership loan financing" or "dealer capital loans" was comparable to its role with "floor plan financing." But, in the case of "dealership loan financing," the Richmond Branch actually received payments on the loan amount, noted their receipt, and then forwarded the payments "to a Ford Credit lockbox for posting to the account."

FMCC's witness who qualified as an "expert in the field of accounting" and "in state and local . . . business license taxes" summarized in detail how a consumer installment loan to purchase a vehicle was processed, maintained, and serviced by FMCC:

> A loan gets made at the dealer level and the paperwork goes to the branch, it's approved at the branch. Branch personnel make sure that the underwriting standards are in keeping with the parameters of the company. They then approve the loan and then within 30 days, that loan package is then

7

forwarded on to a service office.  In this case, it was Columbia during the four years in question.

At the service office, the loan is administered. If there are late payments, someone follows up.  They record the payments. If there is a need for administrative changes in the loans, such as change of address, they handle that.  If there's a problem with a loan, if refinancing is a requirement, if a payment needs to be skipped, they handle these matters.  They also handle matters relating to the loan if the loan goes into default, and then they bring in either the Livonia office, which would handle the bankruptcy proceeding, if one was involved, or – and/or one of the recovery centers, and recovery centers handle repossession of the underlying security, the automobile, and then also the disposal of that automobile in recovery of the principal on the debt.

The headquarters serves a very important function as well.  They handle the marketing of the company. They handle the general overall strategy of the company.  They set the audit or, rather, the underwriting standards so that they can mitigate the risk on the loans in the loan portfolios that are made by FMCC.  They also work within the marketplace to secure capital so that the capital can be loaned to individuals to buy automobiles.  They also handle securitization for those loan packages, and securitization is merely a secondary market activity where they securitize the loans and then receive funds in exchange for the securitization so that they can reloan those funds to the borrowers.

The accounting expert also testified that FMCC used an accrual accounting method, meaning that FMCC recorded loans as receivables on a balance sheet when they were made, and "booked" revenue on an income statement when payments of interest and fees were due.  In the event of a default on a loan, "revenue would be booked when the security [was] sold and the principal satisfied on the note," resulting in "either . . . a gain or a

8

loss on the loan."  Loans approved and closed by the Richmond Branch were not "booked" there for Virginia or federal income tax, or any other, purposes.

The expert testified that the "internal accounting system" relied on by the County to justify their attribution of gross receipts to the Richmond Branch, known as "MAPS" or "management, analysis, and performance system," was accurate but was a "contract revenue-based system."  He stated that MAPS "associates revenue attributable to loans . . . and leases . . . that . . . come from the business that FMCC conducts with its dealers," allowing FMCC to determine at which dealers the loans "were completed," and which branches processed the loans. However, according to the expert, MAPS was "not an activity[-]based system at all" and thus did not attribute revenue based on the activities or work of personnel at the Richmond Branch, or anywhere else, or even track "which office is responsible for what activities with respect to a particular loan[.]"  The expert doubted whether "a system could be devised . . . to track and attribute revenue based on where services are performed," concluding "it would be very difficult to do."  He explained that "[t]here's no way to take . . . one payment or . . . one dollar of interest . . . and take that and distribute it among all of the activities that may come into play on that loan." Thus, he concluded that it was "impossible or impractical to

utilize . . . the general rule" of attribution and that "payroll apportionment" was the appropriate method to determine the BPOL tax FMCC owed the County during the years in question. The expert explained that payroll apportionment reflects all the activities that generated revenues when FMCC loaned money to customers, received payments from customers, addressed inquiries from customers, and repossessed vehicles from customers.

Having completed a payroll apportionment calculation, FMCC's expert stated that either the sum of $1,428,534 or $1,414,913 should be refunded to FMCC. He believed that FMCC erred in reporting gross receipts for all loans originating in the Richmond Branch and failing to take into account "that other offices [came] into play to administer those loans and those leases and the important functions that Dearborn provide[d] in order for the business to be viable." Explaining the deduction allowed in Code § 58.1-3732(B)(2), he also stated that FMCC failed to take the deduction "for receipts that [were] attributable to the conduct of business in other states where the company [was] liable for an income tax."

A regional sales manager for FMCC testified that without the work of the various offices that dealt with loans originating in the Richmond Branch, FMCC would not collect the full amount due under its loan contracts. Similarly, FMCC's tax counsel opined that the service centers "add value" to the loans

because their activities "generat[e] monies." He further stated that tracking revenue based on services provided by FMCC was not possible.

In contrast, the County's Commissioner of Revenue (the Commissioner) stated that FMCC provided "a product to their customers, the product being money in the form of loans." He further testified that for purposes of BPOL taxation for a financial services company like FMCC, "[g]enerating gross receipts is the set of activities or things that a business does to actually get the receipt into the business," i.e., "the activities . . . directly related to creating the receivable" such as having "a customer sign on the dotted line and issue the loan, giv[ing] the money to the dealer so that customer can drive that car home." But, according to the Commissioner, "[c]ollecting gross receipts" is not a "set of activities . . . that a business does to actually get the receipt into the business" but is only a "necessary process of any business that has a receivable." He also stated that "[g]enerating is taking the necessary actions to create a receivable or to make the sale so that somebody pays you" and that "receipt occurs after somebody collects what they want to collect." FMCC's centers outside the Richmond Branch did not, in the Commissioner's opinion, "generate gross receipts." Nevertheless, he admitted that he had never seen a document that tracked FMCC's revenues

11

based on the location where services were provided.  The Commissioner admitted that "there is no proper way to apportion" FMCC's gross receipts.

Upon reviewing the evidence, presented through exhibits and testimony, the circuit court denied FMCC's application and dismissed it with prejudice.  In a letter opinion incorporated in its final order, the circuit court found that FMCC's business was that of providing "retail financing, wholesale financing (also called 'floor plan financing'), and a . . . catchall category referred to as 'other financing.'"  According to the court, "the Richmond Branch operated as a loan origination office" for all three types of financing, and "marketed and closed" primarily "consumer loans for individual new and used cars."

The circuit court concluded that "the Richmond Branch's marketing and closing operations generated gross receipts in the form of interest and fees."  FMCC then "recorded the loans as receivables and forwarded them to service centers for servicing and collection."  The court found that MAPS "allowed the company to accurately track the gross receipts generated by each sales office," thereby attributing to the Richmond Branch only the gross receipts generated there.  The court expressly rejected FMCC's argument that "the MAPS figures for the Richmond Branch were intended for internal management purposes only" and did not

12

reflect where the gross receipts were actually generated. Instead, the court found "that the MAPS figures accurately reflect the gross receipts generated as [a] result of the distinct efforts of the Richmond Branch." Thus, the court concluded that "[b]ecause the Richmond Branch generated gross receipts from a definite place of business in Chesterfield County, imposition of BPOL tax on the gross receipts generated [there is] consistent with" Code § 58.1-3703.1(A)(3)(a)(4).

Although the circuit court also found that "[a]fter closing, loans generated by the Richmond Branch were transferred for portfolio management to 'service centers' organized and operated by FMCC in three other states[,]" it nevertheless concluded, "[t]he service centers neither created new loans nor added value to existing loans--they simply managed loans generated and closed by the Richmond Branch[; t]he service centers did not <u>generate</u> gross receipts." (Emphasis added.) Likewise, the court concluded that although the Richmond Branch was "overseen by a regional office . . . and by FMCC corporate headquarters," which provided "management policy" assistance to the Richmond Branch and were "known as 'cost centers,'" "neither office <u>generated</u> gross receipts." (Emphasis added.)

Further, the circuit court found that no "gross receipts generated by the Richmond Branch were taxed by, or rendered subject to taxation by, any other jurisdiction," as "FMCC

13

reported none of the gross receipts taxed by [the] County for taxation in any other state."  However, the parties did stipulate that for all the relevant tax years, "FMCC filed state income tax or income tax-like returns in 47 states and the District of Columbia."

The circuit court, thus, also rejected FMCC's argument that the gross receipts must be "apportioned by payroll," concluding that "determination of the gross receipts generated by the Richmond Branch . . . is neither impractical nor impossible." The circuit court expressly noted that "MAPS[] provides a reliable and accurate accounting of the gross receipts generated by the Richmond Branch," and that none of the "service centers" or "cost centers" located elsewhere "generated gross receipts within the meaning of applicable BPOL guidelines," but only "served the interests of FMCC."  Therefore, it held that "the assessments in this case were based solely on gross receipts generated by the Richmond Branch for services performed within the County."

Also, the circuit court rejected FMCC's challenge to the assessments as violating the fair apportionment prong of the four-part Commerce Clause test for local taxation set forth in Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279 (1977). The circuit court determined that "the income attributed to the Richmond Branch was not 'out of all appropriate proportion' to

14

the business transacted in the locality," and that FMCC faced no risk of "double taxation."  The circuit court, accordingly, entered an order denying FMCC's application, affirming the assessment (with the County's requested increase),[5] and dismissing the action.  We awarded FMCC this appeal.

ANALYSIS

Although FMCC raises multiple assignments of error challenging the circuit court's judgment, the dispositive issue is whether the circuit court erred in holding that the County properly attributed all gross receipts for loans that originated in the Richmond Branch to FMCC's services provided in the County, without apportionment or deduction.  Because this issue presents a mixed question of law and fact, we conduct a de novo review.  Luria v. Board of Dirs. of Westbriar Condo. Unit Owners Ass'n, 277 Va. 359, 365, 672 S.E.2d 837, 840 (2009). "In our review of the circuit court's application of the law to the facts, we give deference to the circuit court's factual findings and view the facts in the light most favorable to the [County], the prevailing party below."  Id.

The provisions of Code § 58.1-3703(A) set forth the sole grant of authority for localities to levy BPOL taxes.  In pertinent part, the statute states:

_____

[5] The circuit court actually increased the County's BPOL assessment to $1,791,438.13, which is the subject of an

15

> The governing body of any county, city or town
> . . . may levy and provide for the assessment and
> collection of county, city or town license taxes on
> businesses, trades, professions, occupations and
> callings and upon the persons, firms and corporations
> engaged therein within the county, city or town.

See Code § 58.1-3702 ("The provisions of this chapter[, Chapter 37, titled License Taxes, of Subtitle III, titled Local Taxes, of Title 58.1, titled Taxation,] shall be the sole authority for counties, cities and towns for the levying of the license taxes described herein.")

When reviewing whether a particular subject of taxation, in this case, gross receipts, falls within a locality's statutory power to tax, we apply the rule that such

> [s]tatutes imposing taxes are to be construed most
> strongly against the government, and in favor of the
> citizen, and are not to be extended by implication
> beyond the clear import of the language used. Whenever
> there is a just doubt, "that doubt should absolve the
> taxpayer from his burden."

City of Winchester v. American Woodmark Corp., 250 Va. 451, 456-57, 464 S.E.2d 148, 152 (1995) (Woodmark I) (quoting Commonwealth Natural Res., Inc. v. Commonwealth, 219 Va. 529, 537-38, 248 S.E.2d 791, 796 (1978)); accord Commonwealth v. Appalachian Electric Power Co., 193 Va. 37, 46, 68 S.E.2d 122, 127 (1951).

Nevertheless, "a tax assessment made by the proper authorities is prima facie correct and valid, and the burden is

---

assignment of error.

on the taxpayer to show that such assessment is erroneous." Commonwealth v. American Radiator & Standard Sanitary Corp., 202 Va. 13, 18, 116 S.E.2d 44, 47 (1960); see also Code § 58.1-3984(A) (in proceedings to correct erroneous assessment of local levies, "the burden of proof shall be upon the taxpayer to show that . . . the assessment is . . . invalid or illegal"); LZM, Inc. v. Virginia Dep't of Taxation, 269 Va. 105, 109, 606 S.E.2d 797, 799 (2005) (applying presumption of validity to an assessment of sales tax and stating that "the burden is on the taxpayer to show that such assessment was the result of 'manifest error' or in 'total disregard of controlling evidence' ") (citation omitted); Department of Taxation v. Lucky Stores, Inc., 217 Va. 121, 127, 225 S.E.2d 870, 874 (1976) (holding in a challenge to the imposition of income taxes that "the taxpayer [was] confronted with a presumption of validity attached to the decision" of the taxing authority and that "the burden [was] on the taxpayer to prove that the assessment [was] contrary to law or that the [taxing authority] abused [its] discretion and acted in an arbitrary, capricious or unreasonable manner").

The General Assembly has imposed certain restrictions on the assessment of BPOL taxes.  The provisions of Code § 58.1-3706 impose limits on the rate of taxation that localities may impose on gross receipts.  Further, any local ordinance "levying

17

such license taxes [must] include the provisions of [Code] § 58.1-3703.1."  Code § 58.1-3703(A); see also Code § 58.1-3703.1(A).

Code § 58.1-3703.1 contains the primary limitations governing BPOL taxation, and provides a "[g]eneral rule" for the situs of gross receipts in subsection (A)(3)(a):

> Whenever the tax imposed by this ordinance is measured by gross receipts, the gross receipts included in the taxable measure shall be only those gross receipts attributed to the exercise of a privilege subject to licensure at a definite place of business within this jurisdiction.

Code § 58.1-3703.1(A)(3)(a).  That subsection then specifies four different situs rules applicable to four types of businesses, including one for service businesses: "The gross receipts from the performance of services shall be attributed to the definite place of business at which the services are performed or, if not performed at any definite place of business, then to the definite place of business from which the services are directed or controlled."  Code § 58.1-3703.1(A)(3)(a)(4).

Neither party contests that FMCC was a service business for purposes of Code § 58.1-3703.1(A)(3)(a)(4).  Specifically, FMCC provided "[f]inancial services," meaning "the buying, selling, handling, managing, investing, and providing of advice regarding money, credit, securities, or other investments."  Code § 58.1-

18

3700.1; see also 23 VAC § 10-500-10 (defining "financial services" as "the buying, selling, handling, managing, and investing [of] money, credit, securities, or other investments for others, as well as providing advice to others on such matters") (emphases added); 23 VAC § 10-500-390 (providing a list of financial services, including "[i]nstallment financing," "[i]nventory financing," "[c]onsumer financing," and "[l]oan or mortgage companies"). Thus, the general rule of attribution set forth in Code § 58.1-3703.1(A)(3)(a)(4) applies to FMCC unless, as the licensee, it "has more than one definite place of business and it is impractical or impossible to determine to which definite place of business gross receipts should be attributed under the general rule." Code § 58.1-3703.1(A)(3)(b). In that instance, gross receipts must be "apportioned between the definite places of business on the basis of payroll." Id.

Both parties, and the circuit court, also agreed that FMCC had several definite places of business outside the County that managed FMCC generally, oversaw the Richmond Branch's operations, and administered the loans originating at the Richmond Branch. See Code § 58.1-3700.1 (defining "definite place of business" to mean "an office or a location at which occurs a regular and continuous course of dealing for thirty consecutive days or more"). FMCC, however, disputes the circuit

19

court's holding that the gross receipts in question were solely "generated by the Richmond Branch for services performed within the County." Because, according to FMCC, most of the gross receipts were not "directly attributable to the taxable privilege exercised within [the County]" but rather to the performance of financial services at various FMCC offices across the nation, it contends that it was "impractical or impossible to determine to which definite place of business gross receipts should be attributed." Code § 58.1-3703.1(A)(3)(b). Thus, FMCC asserts that "the gross receipts of [FMCC's Richmond Branch must] be apportioned between the definite places of businesses on the basis of payroll," pursuant to Code § 58.1-3703.1(A)(3)(b).

Relying on language appearing in the Virginia Administrative Code, the County, however, contends that the financial service FMCC provided was "the 'selling' of 'money' through installment loans 'to others.' " 23 VAC § 10-500-10. FMCC's service centers and cost centers, according to the County, did not provide " 'financial services' to others." (Emphasis added.) Instead, argues the County, those out-of-state centers merely served FMCC's interests by collecting the receivables generated when the Richmond Branch sold and closed a loan, with the terms and amount of repayment being fixed at closing. Thus, the County contends that only the Richmond

20

Branch's activities qualified as a financial service business that generated gross receipts.

Because FMCC, as a financial services business, had definite places of business in multiple jurisdictions outside the County, this Court must determine, first, whether the circuit court erred in its application of the law to the facts of this case by holding that all the gross receipts taxed by the County were attributable "to the exercise of a privilege subject to licensure at a definite place of business within" the County. Code § 58.1-3703.1(A)(3)(a); see also 23 VAC § 10-500-10 (defining "gross receipts" as "money . . . received . . . as a result of transactions with others . . . and that are derived from the exercise of the licensed privilege").  If we answer that question affirmatively, we then must decide whether the circuit court erred in holding that it was "neither impractical nor impossible" to attribute the gross receipts to the performance of services at a specific, definite place of business, and that payroll apportionment was not required.  In other words, the questions are whether FMCC carried its burden to prove that the gross receipts taxed by the County were not attributable solely to the performance of financial services at a definite place of business in the County, Code § 58.1-3703.1(A)(3)(a)(4), and whether the County's BPOL assessment must be "apportioned . . . on the basis of payroll" because "it

is impractical or impossible to determine to which definite place of business gross receipts should be attributed." Code § 58.1-3703.1(A)(3)(b).

In determining whether the gross receipts in question were attributable solely to FMCC services rendered in the County, we turn for guidance to this Court's decision in City of Winchester v. American Woodmark Corp., 252 Va. 98, 471 S.E.2d 495 (1996) (Woodmark II). In that case, the City of Winchester had imposed BPOL taxes on "100% of American Woodmark's revenues" although only its corporate headquarters were located in the City, and "manufacturing and distribution centers as well as service and sales offices" numbering "24 facilities in 13 different states" were also part of American Woodmark's business operations. Id. at 103, 471 S.E.2d at 498. American Woodmark had alleged, and the trial court agreed, that the assessments violated the Commerce Clause "because the City had not fairly apportioned the assessments to tax only those gross receipts attributable to [its] business activities within the City." Id. at 101, 471 S.E.2d at 497. In resolving this challenge, the Court applied the relevant Commerce Clause test, which requires that the BPOL tax apply "only to the 'portion of the revenues from the interstate activity which reasonably reflects the in-state component of the activity being taxed.' " Id. at 102, 471 S.E.2d at 497 (quoting Goldberg v. Sweet, 488 U.S. 252, 262

(1989)). The Court concluded that "[c]ommon sense compels the conclusion that these [out-of-jurisdiction] operations added value to American Woodmark's business product and were revenue producing activities." Id. "[I]t [was] equally axiomatic that the value added to the product by the Winchester operations could not possibly produce 100% of the revenues." Id. Thus, in resolving American Woodmark's Commerce Clause challenge to the BPOL taxes, the Court held that "American Woodmark [had] met its burden of proof by presenting clear and cogent evidence that the income which the City through its assessments attributed to operations conducted in Winchester [were] 'out of all appropriate proportions to' and [had] 'no rational relationship' to the business transacted in Winchester." Id. Although a statutory challenge[6] was not presented in Woodmark II but only a challenge under the Commerce Clause, the Court's holding, by implication in the context of the present case, means that the gross receipts the City had included in the taxable measure were not "only those gross receipts attributed to the exercise of a privilege subject to licensure at a definite place of business" in the City of Winchester. Code § 58.1-3703.1(A)(3)(a). See

_____

[6] The BPOL situs statute then in effect was former Code § 58.1-3707, which limited the localities' power to tax based on "volume" to "the volume attributable to practice in" the relevant locality, with "volume" meaning "gross receipts or any other base for measuring a license tax which is related to the amount of business done." Former Code § 58.1-3707(A) and (D).

23

Woodmark II, 252 Va. at 103, 471 S.E.2d at 498 (holding that because the out-of-jurisdiction activities were "revenue producing," "[b]y definition, assessments based on 100% of American Woodmark's revenues included revenues realized from value produced in locations other than in the taxing jurisdiction").

Turning to the case before us, we recognize that when a consumer or dealer executed an installment loan contract with FMCC and the loan documents were returned to the Richmond Branch and then forwarded to a service center, FMCC's entitlement to monies (principal, interest, and fees) with respect to that particular loan was fixed by the loan contract's terms. In the County's nomenclature, money had been sold at that point, but FMCC had only a receivable, not gross receipts. As the County's Commissioner of Revenue acknowledged, "[t]here is" "a difference . . . between a gross receipt . . . and a receivable," and Code § 58.1-3703.1(A)(3)(a)(4) renders that difference significant here. When, as in this case, the BPOL tax "is measured by gross receipts," the gross receipts that the County could include "in the taxable measure" were "only those gross receipts attributed to the exercise of" the licensed privilege, financial services, at a definite place of business in the County. Code § 58.1-3703.1(A)(3)(a). And when financial services provided in other jurisdictions contribute to the derivation of the gross

24

receipts, those services must be accorded some proportion of the gross receipts, and the BPOL "taxable measure" reduced accordingly.

Thus, we do not agree with the County's position that gross receipts were generated when, for example, a customer simply signed "on the dotted line" and the loan was made. The gross receipts derived from the exercise of FMCC's licensed privilege to conduct a financial services business – to provide installment and inventory financing – were not attributable solely to the performance of financial services at the Richmond Branch. To accept the County's position and the circuit court's holding would mean that all services necessary to FMCC's deriving gross receipts from its consumer installment and inventory financing operations were provided at the Richmond Branch. But, such are not the facts of this case.

The money to sell to consumers and dealers through installment and inventory financing came from FMCC's headquarters in Michigan. Part of the headquarters' operations was the securing of capital so that money could be loaned to consumers to purchase vehicles and to dealers for floor-plan financing and physical plant improvements. FMCC's headquarters also obtained securitization of loan packages. The operations of FMCC's service centers included, among other things, helping consumers with administrative changes in their loans such as

25

changes of address and re-financings.  FMCC also served its customers by titling vehicles, tracking loan repayment progress, providing statements, and logging payments.  All these activities were an integral part of the financial service of installment and inventory financing and were proven by "clear and cogent evidence."  Woodmark II, 252 Va. at 103, 471 S.E.2d at 498.  In other words, the operations of the Richmond Branch did not produce 100 percent of the gross receipts that the County taxed.[7]  See id.

Thus, we conclude that the circuit court erred in holding that all the taxed gross receipts were "attributed to the exercise of a privilege subject to licensure at [the Richmond Branch] within [the County]."  Code § 58.1-3703.1(A)(3)(a).  We find support for the conclusion we reach today in the rulings of the Virginia Department of Taxation (the Department).  See Code § 58.1-205(3) (directing courts to "accord[] judicial notice" to the Department's duly promulgated rulings).  In Public Document (P.D.) 97-284 (June 25, 1997), the Tax Commissioner advised a

---

[7] Nothing in our analysis of Code § 58.1-3703.1(A)(3)(a) should be read to control when gross receipts may be taxed, but only which gross receipts, whenever taxable, a locality may tax under Code § 58.1-3703.1(A)(3)(a).  Even though gross receipts may be reported based on the accrual method, see, e.g., Monument Assocs. v. Arlington Cnty. Bd., 242 Va. 145, 147-78, 408 S.E.2d 889, 890 (1991), the BPOL taxable measure can only include "those gross receipts attributed to the exercise of a privilege subject to licensure at a definite place of business" in the taxing jurisdiction.  Code § 58.1-3703(A)(3)(a).

26

locality with regard to the assessment of BPOL taxes on a business that operated a laboratory for collecting specimens. The business sent the collected specimens to facilities outside the locality for "actual testing," and the business' billing and collection operations occurred at its headquarters located in another state.  The Tax Commissioner concluded that "both the collection and the testing of specimens [were] part of the services performed by the taxpayer."  Thus, the locality could impose a BPOL tax on the gross receipts that were attributed to the specimens' collection, but not on the gross receipts attributable to the specimens' testing.  The Tax Commissioner further stated that if it was "impossible or impractical to determine which gross receipts [were] attributed to the collection of the specimens and which gross receipts [were] attributed to the testing of the specimens," the locality should apportion gross receipts on the basis of payroll.

The operations of FMCC's headquarters in securing capital for loans to consumers and dealers are comparable, for our purposes, to the laboratory's collecting of specimens. Obviously, specimens cannot be tested until they are collected and, similarly, loans cannot be made unless there is available capital.  Moreover, loans, by definition, cannot be made without any mechanism for repayment and administrative changes.  In short, those activities – obtaining capital, collecting

27

payments, and helping customers make changes in their loans – provide a financial service "to others." 23 VAC § 10-500-10. Thus, we reject the County's argument that FMCC's service centers "serve[d] only the taxpayer's interest, and no other," and thus did "not give rise to gross receipts." 23 VAC § 10-500-60; see P.D. 99-92 (Apr. 30, 1999) (stating that a locality may attribute gross receipts to a "[b]usiness's 'bookkeeping' operation" if the bookkeeping "includes soliciting orders for coal, offering bookkeeping services to others, or engaging in transactions involving customers"); see also 23 VAC § 10-500-10 (requiring that "financial services" be provided "to others").

The Tax Commissioner followed a similar rationale regarding attribution of gross receipts in P.D. 99-87 (Apr. 23, 1999). There, a locality requested an advisory opinion on the attribution of gross receipts regarding a financial services business that "originates loans and forwards all responsibility for loan servicing, customer relations and possible sale to an office of the business located in another locality or state." The Tax Commissioner stated that he lacked "sufficient facts to determine the definite place of business to which the receipts should be attributed," but did offer that "the receipts . . . appear to be derived from activities conducted at definite places of business both within and without your jurisdiction." (Emphasis added.) The Tax Commissioner, accordingly, directed

28

that the locality "ascertain the nature of the business activities conducted at the different places of business and the extent to which these activities contribute to the different types of receipts."  This opinion, contemplating attribution of gross receipts to activities such as "loan servicing" and "customer relations" by a financial services business is inconsistent with the bright-line rule pressed by the County, which is that all gross receipts received by FMCC for the loans that originated and were closed at the Richmond Branch were 100 percent attributable to that situs.

Our conclusion is not altered by FMCC's internal accounting system, MAPS.  As explained by FMCC's expert, that was a "contract revenue-based system" and did not track gross receipts based on financial services rendered to others.  Even the Commissioner of Revenue admitted that he was not aware of any document that tracked FMCC's revenues based on the location where financial services were provided.  Therefore, the fact that MAPS assigned revenue to the Richmond Branch does not determine where gross receipts properly were attributable pursuant to Code § 58.1-3703.1(A)(3)(a).

Further, the circuit court erred in concluding that it was not "impractical or impossible to determine to which definite place of business gross receipts should be attributed" under the rule that the "gross receipts from the performance of services

29

shall be attributed to the definite place of business at which the services are performed." Code § 58.1-3703.1(A)(3)(a)(4) and (b). As already noted, there was uncontradicted evidence that MAPS tracked revenues by contract, but did not track the financial services performed over the life of the loan. And, FMCC's expert testified that "[t]here's no way to take . . . one payment or . . . one dollar of interest . . . and take that and distribute it among all of the activities that may come into play on that loan." Therefore, having concluded that the facts, as found by the circuit court, demonstrated that financial services outside the County contributed to the realization of FMCC's gross receipts, we further conclude that it would be impossible or, at least, impractical to perform that process on every one of the approximately 20,000 loans processed annually by the Richmond Branch, spanning the tax years of 2001, 2002, 2003, and 2004. See P.D. 04-80 (Aug. 25, 2004) (holding that "payroll apportionment" is "the most appropriate method of assessing the Taxpayer for BPOL purposes" "[g]iven the Taxpayer's multistate activities and the fact that its accounting procedures are contract driven, rather than service driven"); accord P.D. 05-117 (July 19, 2005) (same). Accordingly, we hold that because the gross receipts in question were attributable to services performed outside the County, and that "it is impractical or impossible to determine to which

30

definite place of business gross receipts should be attributed," FMCC's BPOL tax assessment must be calculated using payroll apportionment.  See Code § 58.1-3703.1(A)(3)(b).

Finally, when FMCC's BPOL tax assessment is re-calculated, FMCC's entitlement to a deduction under Code § 58.1-3732(B)(2) must be determined.  That statute provides that "[a]ny receipts attributable to business conducted in another state or foreign country in which the taxpayer (or its shareholders, partners or members in lieu of the taxpayer) is liable for an income or other tax based upon income" "shall be deducted from gross receipts . . . that would otherwise be taxable."  Code § 58.1-3732(B)(2).  FMCC contends that the stipulation to its filing "income or income-like tax returns in 47 states and the District of Columbia" means that it was entitled to deduct all gross receipts "attributable to business conducted" in those states. Cf. 23 VAC § 10-500-80(A)(2) ("A Virginia taxpayer is liable for an income or other tax based upon income if the taxpayer files a return for an income or income-like tax in that state or foreign country.")  While a "taxpayer . . . need not actually pay any tax to take the deduction," 23 VAC § 10-500-80(A)(2), a taxpayer may deduct gross receipts attributable to business conducted in another state only if the taxpayer demonstrates that it "actually reports those receipts . . . on its out-of-state

31

income tax returns."[8]  P.D. 07-142 (Sept. 5, 2007) (emphasis

added).

CONCLUSION

For the foregoing reasons, we will reverse the judgment of

the circuit court and remand the case for further proceedings.[9]

Reversed and remanded.

SENIOR JUSTICE LACY, with whom SENIOR JUSTICE CARRICO joins,
dissenting.

The majority opinion holds that to determine the Business,

Professional, and Occupational (BPOL) license tax assessment for

the Richmond Branch of Ford Motor Credit Company (FMCC or the

company), an international lending institution, Chesterfield

County must apportion the gross receipts generated by the

Richmond Branch[1] by the payroll apportionment method based on

FMCC's entire payroll.  To reach this result, the majority holds

that (1) even though the company itself considers its gross

receipt revenues as generated by the location where the loan

contract was originated and designates other locations and their

activities as "cost" or "service" centers, other activities of

---

[8] We express no opinion regarding FMCC's entitlement to a
deduction under Code § 58.1-3732(B)(2) or regarding what portion
of FMCC's payroll should be included in a payroll apportionment
calculation.

[9] In view of the Court's decision, it is unnecessary to
address the remaining assignments of error.

[1] FMCC produced an exhibit showing that the amount of the
gross receipts generated by the Richmond Branch ranged from 4.0

the company, such as those directed at collecting monies owed the company pursuant to an executed contract, are activities contributing to the "realization" or the "derivation" of the company's gross receipts, a standard not heretofore applied by this Court or the Tax Commissioner; and (2) because the company only utilizes a tracking system that assigns gross receipts to the site at which the contract securing those receipts is executed, it is "impractical or impossible" to determine what part of the gross receipts revenue came from the locations at which these other activities and services were conducted.

I cannot join the majority opinion for the following reasons. First, as the majority recites, the Richmond Branch of FMCC "was tasked with contacting and training dealers to increase vehicle sales and the number of loans made by FMCC, approving loan applications, determining loan interest rates, and providing programs and training for dealers concerning FMCC's financing programs." The company's gross receipts, fees and interest are generated and established at the time the loan contract is executed. These executed contracts are the result of activities undertaken by the Richmond Branch.

In my opinion, collection activities of a company do not add value or generate any further gross receipts. This view is

---

percent to 5.3 percent of the company's total gross receipts for the years in question.

consistent with the views of the Tax Commissioner as set out in the guidelines promulgated and opinions rendered for the application of the BPOL tax.  See Virginia Department of Taxation, Business, Professional and Occupational License Tax: 2000 BPOL Guidelines (Jan. 1, 2000) (hereinafter BPOL Guidelines).  In Chapter 1 of the BPOL Guidelines the "[s]itus of gross receipts" is defined as "the definite place of business that generated taxable gross receipts."  (Emphasis added.)  Section 2.4 of the BPOL Guidelines provides that "[a]ctivities of a taxpayer which serve only the taxpayer's interest, and no other, do not give rise to gross receipts."  BPOL Guidelines § 2.4.  The collection activities at issue here, in my opinion, do not benefit the borrower and do not generate or add value to the product whose sale produces gross receipts for the company.  These collection services are only a cost of doing business for the lending company.

Our case law has recognized services or activities that enhance the product delivered to the consumer as services that generate gross receipts.  For example, in City of Winchester v. American Woodmark Corp., 252 Va. 98, 471 S.E.2d 495 (1996) (Woodmark II), the products manufactured and sold were cabinets. We determined that American Woodmark's cabinet manufacturing and distribution centers, as well as its service and sales offices, added value to its product and generated revenue.  Id. at 103,

471 S.E.2d at 498. These activities enhanced American Woodmark's product bought by the consumer. Id. In this case, the collection activities cited by the majority do not in any way enhance the loan or its interest and fees "purchased" by the consumer. Similarly, although the majority looks to the corporate headquarters as providing the funds for the loans, the record also contains evidence that those funds were generated by offices, such as the Richmond Branch, that originated the loans. Further, neither the evidence, the company nor the majority identifies any enhancement or value added by the regional center to which the Richmond Branch office reported.

The majority's holding also relies heavily on a distinction between a "receipt" and a "receivable." Certainly, the actual funds generated by the loan contracts are received at locations other than the Richmond Branch. Applying this distinction, however, leads to a curious result. If the assessment of the BPOL tax depends on the actual receipt of the gross receipts there could be no assessment at the Richmond Branch because the payments are sent elsewhere. This has never been suggested as part of the law governing the application of the BPOL tax. More important, the receipt of the interest and fees is a collection activity, not a generation activity. Nevertheless, using this distinction, the majority concludes that such financial collection services are activities that "contribut[e] to the

realization of gross receipts" and, thus, are relevant activities for BPOL assessment purposes. This is not the standard that we have heretofore applied. As recited above, for BPOL assessment purposes, an activity must have "produc[ed]" the gross receipts or "added value" to the product sold. Woodmark II, 252 Va. at 103, 471 S.E.2d at 498. "Realization" or actual receipt of a company's gross receipts has not been, and I submit should not be, the standard.

The second reason I cannot join the majority relates to the burden of proof that must be applied in this case. Even if one accepts the thesis that these auxiliary activities generate some part of the company's gross receipts, the company still carries the burden of showing that it is "impractical or impossible" to determine attribution of the gross receipts. Code § 58.1-3703.1(A)(3)(b). In this case, the company itself relied upon an accounting and tracking system (MAPS) that it had devised for tracking revenue – assigning the revenue to the originating locations, such as the Richmond Branch, and designating the collection activities and other services as "cost centers." The majority discounts this accounting system because the system is a "contract revenue-based system" and because a company witness testified that it would be "very difficult" to create a system allocating gross receipts to these other services. That a system might be difficult to create does not make it impractical

36

or impossible to create.  There is no evidence that FMCC, sophisticated enough to create its extensive accounting system, MAPS, ever attempted to apportion the gross receipts based on its new theory of revenue generation, even though it could identify those locations which it now claims are not cost centers but revenue centers with regard to gross receipts originated by the Richmond Branch.  Although the company clearly identifies which of these "cost centers" were involved with the Richmond Branch,[2] the majority allows FMCC to use the payroll allocation method based on FMCC's entire national and international payroll for assessing the BPOL tax due on the gross receipts originating at FMCC's Richmond Branch.

In summary, for the years 2001 through 2004, FMCC paid Chesterfield County $1,515,935.05 in BPOL taxes based on the gross receipts reported by FMCC for the Richmond Branch.  In this lawsuit, FMCC seeks a refund of $1,414,913.05, approximately 93 percent of those payments, based on the application of the payroll apportionment method, using all employees on FMCC's payroll regardless of their location or

---

[2] The offices identified by FMCC included the home office in Dearborn, Michigan; a regional office in Chantilly, Virginia; loan administration offices in Baltimore, Maryland, Nashville, Tennessee, and Omaha, Nebraska; a national recovery center in Mesa, Arizona; and a bankruptcy specialist office in Livonia, Michigan.  Other than the home and regional office, these other locations were engaged in administering the loans generated by the Richmond Branch.

connection to the loans, fees and interest generated by the Richmond Branch.  In my opinion, FMCC is not entitled to such a refund because the gross receipts at issue were generated by the Richmond Branch as originally reported by FMCC, and even under the majority's approach of "contribut[ing] to the realization" of the gross receipts at issue, FMCC did not carry its burden to justify the use of the payroll apportionment method of assessment including its entire national and international payroll.  Accordingly, I respectfully dissent.